[Cite as *In re S.W.*, 2023-Ohio-118.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

PREBLE COUNTY

| | | |
|---|---|---|
| IN RE: | : | |
| | | CASE NOS. CA2022-08-013 |
| S.W., et al. | : | CA2022-08-014 |
| | : | O P I N I O N |
| | | 1/17/2023 |
| | : | |
| | : | |
| | : | |

APPEAL FROM PREBLE COUNTY COURT OF COMMON PLEAS
JUVENILE DIVISION
Case Nos. 2021 3049; 2021 3050

David J. Fierst, for appellant, Mother.

Ryan Agee, for appellant, Father.

Martin P. Votel, Preble County Prosecuting Attorney, and Sean Brinkman and Kathryn M. West, Assistant Prosecuting Attorneys, for appellee.

**S. POWELL, P.J.**

{¶ 1} Appellants, the biological mother and father of S.W. and Sh.W., appeal the decision of the Preble County Court of Common Pleas, Juvenile Division, granting permanent custody of S.W. and Sh.W. to appellee, Preble County Job and Family Services, Children Services Division ("PCJFS"). For the reasons outlined below, we affirm.

**The Parties**

{¶ 2}   Mother, who was born in 1993, and Father, who was born in 1995, are the biological parents of S.W., a boy, born on January 31, 2020, and Sh.W., another boy, born on February 4, 2021.  Mother and Father, who are themselves a married couple, are also the biological parents of three other children, K.W., D.S., and W.W.  There is no dispute that Mother and Father lost custody of K.W., D.S., and W.W. either prior to this case being initiated or during the pendency of this case.[1]  There is also no dispute that Mother is the biological mother of two additional children of whom she lost custody prior to the initiation of this case and who are now in the legal custody of their biological father(s).

**Facts and Procedural History**

{¶ 3}   On June 17, 2021, PCJFS filed a complaint alleging S.W. and Sh.W. were dependent children.[2]  To support its complaint, PCJFS alleged that it had gone to Mother and Father's home in the summer of 2020 to investigate a report that Mother had  given birth to her and Father's fourth child, S.W.  PCJFS alleged that upon contacting Mother at her and Father's home that she denied giving birth to S.W. and instead claimed that "she babysits for a relative."  PCJFS alleged that Mother made these claims despite there being a full baby bottle sitting in plain view on the couch and a crib located in one of the home's bedrooms.  PCJFS alleged that Mother then admitted that she had given birth to S.W., but claimed that she had signed custody of the child over to S.W.'s maternal grandmother because she could not properly care for him.  S.W.'s maternal grandmother denied Mother's claim and instead told PCJFS that she had "only seen [S.W.] for about 30 minutes his whole

---

1. The record indicates PCJFS originally became involved with Mother and Father and their three older children, K.W., D.S., and W.W., in early 2018.

2. We note that although S.W. and Sh.W. had been given different case numbers, for ease of discussion, and because the filings are substantially similar in both cases, we will refer to the record as if S.W. and Sh.W. were filed under the same case number throughout this opinion.

life."

{¶ 4} PCJFS alleged that Mother then claimed that S.W. was actually not at home at that time. PCJFS also alleged that Mother refused to disclose where S.W. was or who S.W. may have been with. PCJFS alleged that the police were then called to the home to look for S.W. S.W., however, was nowhere to be found. PCJFS alleged that this was just one of the "multiple attempts" it undertook to locate S.W. by making unannounced stops at Mother and Father's home and knocking on the door. However, despite multiple attempts to locate S.W. at the home, PCJFS alleged that "no one answered the door and no contact was made [with] the family" even though there were "dogs in the home and an air conditioner running." The record indicates that S.W. was subsequently located by police a few weeks later and placed into PCJFS' temporary custody following an emergency shelter care hearing.

{¶ 5} Continuing with its complaint, PCJFS alleged that several months later, in the winter of 2021, it received a report that Mother had given birth to her and Father's fifth child, Sh.W. There is no dispute that while she was pregnant with Sh.W. Mother tested positive for methamphetamine. There is also no dispute that Mother admitted to using drugs while pregnant with Sh.W. and that Father was not present for Sh.W.'s birth because he was serving time in prison. Similar to S.W., the record indicates Sh.W. was then placed into PCJFS' temporary custody following an emergency shelter care hearing. This occurred prior to Sh.W. ever leaving the hospital. PCJFS then concluded its complaint by summarily alleging Mother and Father had not remedied the concerns that led to either S.W.'s or Sh.W.'s removal from their custody, which included, most notably, their use of illegal drugs. PCJFS then requested, based upon the totality of the circumstances, it be awarded temporary custody of S.W. and Sh.W. to ensure the children's health, welfare, and safety.

{¶ 6} On July 7 and 15, 2021, the juvenile court held adjudicatory and dispositional hearings for both children.[3] During these hearings, Mother and Father admitted that S.W. and Sh.W. were dependent and agreed that the juvenile court should temporarily award custody of the children to PCJFS. The juvenile court thereafter adjudicated S.W. and Sh.W. dependent and issued a dispositional decision awarding temporary custody of the children to PCJFS. The juvenile court did this in separate entries filed on July 8 and 22, 2021, respectively.[4] A case plan was then established that required Mother and Father to obtain and maintain stable employment and housing, complete a mental health assessment and drug and alcohol services, which included submitting to random drug screens, and to attend a parenting class. The case plan also required Father to receive a psychological evaluation. There is no dispute that neither Mother nor Father completed the service requirements set forth within their case plan.

{¶ 7} On October 15, 2021, Mother and Father appeared for their weekly supervised visitation time with S.W. and Sh.W. The record indicates that this this was the last time Mother and Father had in-person contact with either S.W. or Sh.W. despite the opportunity for additional visitation.

{¶ 8} On January 14, 2022, PCJFS filed a motion for permanent custody of both children. The following month, on February 9, 2022, the juvenile court held an initial pretrial hearing on PCJFS' permanent custody motion. Both Mother and Father personally appeared at this hearing with counsel and were provided with notice that a final permanent custody hearing had been scheduled for May 3, 2022. The juvenile court held another

---

3. The record indicates PCJFS had filed an earlier complaint alleging S.W. and Sh.W. were dependent and requesting temporary custody of the children. That complaint, however, was later dismissed without prejudice due to time limitations, thus prompting PCJFS to file a new complaint on June 17, 2021.

4. The juvenile court's July 22, 2021 entry was subsequently amended on July 26, 2021. The modifications made within that amended entry are not pertinent to this appeal.

pretrial hearing on PCJFS' permanent custody motion on April 5, 2022. Both Mother and Father remotely appeared at this hearing with counsel via Zoom and were again provided with notice that a final permanent custody hearing had been scheduled for May 3, 2022.

{¶ 9} On May 3, 2022, the juvenile court held the previously scheduled final permanent custody hearing. Neither Mother nor Father appeared for this hearing. Given their client's failure to appear, both Mother's and Father's counsel moved for a continuance. The juvenile court denied both motions then heard testimony and took evidence from five witnesses in support of PCJFS' motion for permanent custody. This included testimony from both S.W.'s and Sh.W.'s stay-at-home foster mothers, the special advocate whom the juvenile court had appointed for S.W. and Sh.W., and the PCJFS caseworker assigned to S.W.'s and Sh.W.'s case.[5] As part of this testimony, the caseworker testified regarding PCJFS' ongoing concerns regarding Mother and Father's reunification with the children as follows:

> A significant lack of bond, especially with Sh.W., who has been in [his foster home] since he was released from the hospital, less than 10 visits. [S.W.] has been in our care since he was six months old, and again, he has had more virtual visits, so he's heard mother's voice, but at this point, it's been reported that he's not demonstrating [that] significant of a bond anymore. * * * [T]he fact that they haven't attended any in person visits or initiated any contact with me to assist with moving forward with increased visits in a more natural setting where I could get the appropriate service providers in to assist with their parenting practices in building that bond again, the lack of commitment towards prioritizing their children's needs and putting their needs – the children's needs before their own.

{¶ 10} On August 1, 2022, the juvenile court issued a decision granting permanent custody of both S.W. and Sh.W. to PCJFS. In so holding, the juvenile court determined that

---

5. We note that the PCJFS caseworker assigned to S.W.'s and Sh.W.'s case was also the case worker assigned to Mother's and Father's three older children, K.W., D.S., and W.W., of whom Mother and Father have also lost custody.

the children could not be placed with either Mother or Father within a reasonable period of time or that the children should not be placed with Mother and Father. The juvenile court reached this decision because:

> [n]otwithstanding reasonable case planning and diligent efforts by [PCJFS], [Mother] and [Father] have failed continuously and repeatedly to substantially remedy the conditions which caused the children to be removed. They were given case plans and referrals for services and have not utilized the services and resources that were made available to them for the purpose of changing parental conduct to allow them to begin performing parental duties.

{¶ 11} The juvenile court also found that, in addition to "financial concerns" and "marginal living arrangements" since PCJFS first became involved with Mother and Father several years earlier:

> [i]llegal drug use has either been the main reason for or connected to these children's removals and with the parents' other children being placed in the agency's permanent custody. The involvement with the [PCJFS] dates back [several years] and the parents have not cooperated with [either of the two county agencies where Mother and Father have lived during the pendency of this case] or provided proof of employment despite claiming to have employment and it being the reason visits had to be moved.

{¶ 12} The juvenile court further found:

> Both [S.W. and Sh.W.] have suffered various (and some serious) delays, apparently due to parental drug use. [Mother and Father] have been uncommitted to visiting the children (despite it being moved to accommodate the parents' schedule) and neither have made treatment a priority despite having five (5) children removed and being involved with [PCJFS].

{¶ 13} This was in addition to the juvenile court finding:

> It does not appear that either [Mother or Father] gave the entire picture when seeking the limited services they sought and/or they minimized the problems. Drug screen requests were ignored and home visits were made impossible by [Mother and Father]. It appears that [Mother and Father] even lied about their identities to authorities and hid inside their home on one

- 6 -

occasion based upon [S.W.'s and Sh.W.'s paternal grandfather] saying they were inside.

{¶ 14} The juvenile court also determined that it was in S.W.'s and Sh.W.'s best interest to grant permanent custody of the children to PCJFS. The juvenile court reached this decision upon finding the children were doing well and having all their regular and special needs being met in their foster homes with their respective foster families. The juvenile court further found that both S.W. and Sh.W. were "very bonded" to their foster families and "enjoy spending time with each other and with their biological siblings," one of whom was "previously adopted by [Sh.W.'s] foster parents and the other two in the agency's permanent custody awaiting adoption * * *." The juvenile court additionally found that both children's current foster homes were essentially, if not literally, the only homes that S.W. and Sh.W. had known given when they were removed from Mother's and Father's custody and care. This was in addition to the juvenile court finding:

> [S.W. and Sh.W.] need stability and permanency that only permanent custody will provide. The children have special needs that the parents may have at least partially caused. [Mother and Father] have not addressed their actions or inactions that are suspect and do not appear to be equipped to parent the children. The current foster families who wish to become adoptive families have discovered and met the children's basic and special needs (which has not been easy) and the children are stable, happy and provided for now and deserve to have that continue.

**Mother's and Father's Appeal**

{¶ 15} Mother and Father now appeal the juvenile court's decision granting permanent custody of S.W. and Sh.W. to PCJFS, collectively raising three assignments of error for review.

*Permanent Custody Standard of Review*

{¶ 16} Before a natural parent's constitutionally protected liberty interest in the care

- 7 -

and custody of his or her child may be terminated, the state is required to prove by clear and convincing evidence that the statutory standards for permanent custody have been met. *In re R.K.*, 12th Dist. Warren Nos. CA2021-03-027 and CA2021-03-028, 2021-Ohio-3074, ¶ 14, citing *Santosky v. Kramer*, 455 U.S. 745, 759, 102 S.Ct. 1388 (1982). "An appellate court's review of a juvenile court's decision granting permanent custody is generally limited to considering whether sufficient credible evidence exists to support the juvenile court's determination." *In re D.P.*, 12th Dist. Butler No. CA2020-07-074, 2020-Ohio-6663, ¶ 13. "However, even if the juvenile court's decision is supported by sufficient evidence, 'an appellate court may nevertheless conclude that the judgment is against the manifest weight of the evidence.'" *In re C.S.*, 12th Dist. Clinton No. CA2020-04-006, 2020-Ohio-4414, ¶ 15, quoting *In re T.P.*, 12th Dist. Butler No. CA2015-08-164, 2016-Ohio-72, ¶ 19.

{¶ 17} In determining whether a juvenile court's decision is against the manifest weight of the evidence, an appellate court "'weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the finder of fact clearly lost its way and created such a manifest miscarriage of justice that the judgment must be reversed and a new trial ordered.'" *In re S.M.*, 12th Dist. Warren Nos. CA2018-08-088 thru CA2018-08-091 and CA2018-08-095 thru CA2018-08-097, 2019-Ohio-198, ¶ 16, quoting *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, ¶ 20. "In weighing the evidence, there is a presumption in favor of the findings made by the finder of fact and evidence susceptible to more than one construction will be construed to sustain the verdict and judgment." *In re M.A.*, 12th Dist. Butler No. CA2019-08-129, 2019-Ohio-5367, ¶ 15. "We are especially mindful of this in permanent custody cases." *In re M.G.*, 12th Dist. Warren No. CA2020-10-070, 2021-Ohio-

1000, ¶ 26.

*Two-Part Permanent Custody Test*

{¶ 18} R.C. 2151.414(B)(1) sets forth a two-part permanent custody test. *In re M.H.*, 12th Dist. Clermont Nos. CA2021-08-050 thru CA2021-08-052, 2022-Ohio-49, ¶ 30. In accordance with that two-part test, the juvenile court must first find the grant of permanent custody to the agency is in the best interest of the child, utilizing, in part, the factors set forth in R.C. 2151.414(D). *In re D.K.W.*, 12th Dist. Clinton No. CA2014-02-001, 2014-Ohio-2896, ¶ 21. The juvenile court must then find one of the circumstances set forth in R.C. 2151.414(B)(1)(a) to (e) applies. *In re C.B.*, 12th Dist. Clermont No. CA2015-04-033, 2015-Ohio-3709, ¶ 10. "This includes a circumstance, often referred to as the '12 of 22' provision, where the subject child has been in the temporary custody of the agency for at least 12 months of a consecutive 22-month period." *In re A.D.*, 12th Dist. Clermont No. CA2021-11-060, 2022-Ohio-736, ¶ 20, citing R.C. 2151.414(B)(1)(d). This also includes a circumstance where a child, who has not been in the temporary custody of the agency for at least 12 months of a consecutive 22-month period, and who has neither been abandoned nor orphaned, cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents. R.C. 2151.414(B)(1)(a).

{¶ 19} The juvenile court is required under R.C. 2151.414(D)(1) to consider certain enumerated factors when considering the best interest of a child in a permanent custody case. *In re D.E.*, 12th Dist. Warren Nos. CA2018-03-035 and CA2018-04-038, 2018-Ohio-3341, ¶ 32. Pursuant to R.C. 2151.414(D)(1)(a) thru (e), these factors include, but are not limited to: (1) the interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child; (2) the custodial history of the child; (3) the child's need

for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency; and (4) whether any of the factors listed in R.C. 2151.414(E)(7) thru (11) apply in relation to the parents and child. *In re J.C.*, 12th Dist. Brown No. CA2017-11-015, 2018-Ohio-1687, ¶ 22. "The juvenile court may also consider any other factors it deems relevant to the child's best interest." *In re A.J.*, 12th Dist. Clermont No. CA2018-08-063, 2019-Ohio-593, ¶ 24.

**Father's Single Assignment of Error:**

{¶ 20} PERMANENT CUSTODY OF THE MINOR CHILD[REN] IS NOT SUPPORTED BY CLEAR AND CONVINCING EVIDENCE.

{¶ 21} In his single assignment of error, Father argues the juvenile court erred by granting permanent custody of S.W. and Sh.W. to PCJFS. To support this argument, Father raises three issues for this court's consideration. We separately address each those three issues below.

*Father's First Issue Presented for Review*

{¶ 22} In his first issue presented for review, Father argues the juvenile court erred by failing to set forth sufficient findings of fact within its permanent custody decision as required by R.C. 2151.419(B)(1). Pursuant to that statute, "[a] court that is required to make a 'reasonable efforts' determination must issue written findings providing the reasons in support of its determination." *In re J.M.*, 12th Dist. Clermont No. CA2006-11-096, 2007-Ohio-4219, ¶ 17. Specifically, R.C. 2151.419(B)(1) provides:

> A court that is required to make a determination as described in division (A)(1) or (2) of this section shall issue written findings of fact setting forth the reasons supporting its determination. If the court makes a written determination under division (A)(1) of this section, it shall briefly describe in the findings of fact the relevant services provided by the agency to the family of the child and why those services did not prevent the removal of the child from the child's home or enable the child to return safely home.

Therefore, according to Father, because the juvenile court failed to set forth sufficient findings of fact within its permanent custody decision as required by R.C. 2151.419(B)(1), this case must be remanded to the juvenile court to issue an amended decision that includes a brief description of the relevant services PCJFS provided to him and Mother and why those services did not prevent S.W.'s and Sh.W.'s removal from their home or enable the safe return of S.W. and Sh.W. to their home. We disagree.

{¶ 23} Contrary to Father's claim, the requirement set forth in R.C. 2151.419(B)(1) mandating a court to "briefly describe in the findings of fact the relevant services provided by the agency to the family of the child and why those services did not prevent the removal of the child from the child's home or enable the child to return safely home" only applies if the court makes a written determination under R.C. 2151.419(A)(1). The juvenile court in this case did not make a written determination under R.C. 2151.419(A)(1). The juvenile court instead made a determination pursuant to R.C. 2151.419(A)(2)(e) that PCJFS was not required to make reasonable efforts to prevent the removal of S.W. and Sh.W. from their home, eliminate the continued removal of S.W. and Sh.W. from their home, and return S.W. and Sh.W. to their home, given that both Mother and Father had their parental rights involuntarily terminated with respect to three of S.W.'s and Sh.W.'s older siblings, K.W., D.S., and W.W.[6] This was not error as the record fully supports the juvenile court's decision. Father's argument otherwise lacks merit.

---

6. We note that although the juvenile court was not required to make a reasonable efforts determination due to Mother and Father having had their parental rights involuntarily terminated with respect to three of S.W.'s and Sh.W.'s older siblings under R.C. 2151.419(A)(2)(3), the juvenile court nevertheless found within its permanent custody decision that PCJFS had made reasonable efforts to prevent the removal of the children from their home, to eliminate the continued removal of the children from their home, or to make it possible for the children to return safely to their home, and that PCJFS' efforts were "diligent." The record supports the juvenile court's decision.

- 11 -

{¶ 24} Also in his first issue presented for review, Father argues the juvenile court erred by finding it was in S.W.'s and Sh.W.'s best interest to grant permanent custody to PCJFS. This is because, according to Father, the juvenile court's best interest determination was not supported by clear and convincing evidence. Father supports this argument by selectively highlighting the juvenile court's findings that he considers favorable to him and Mother. These select findings, however, do not show the entire picture.[7] Rather, when taken in their entirety, the juvenile court's findings indicate Mother and Father had repeatedly and continuously failed to substantially remedy the conditions that led to S.W. and Sh.W.'s removal from their custody and care. This includes, most notably, their history of illegal drug use. The juvenile court's findings also indicate that neither Mother nor Father had utilized the services and resources that were made available to them to modify the destructive behaviors that were preventing their reunification with S.W. and Sh.W.

{¶ 25} These findings are in stark contrast to the juvenile court's other best-interest findings made in support of PCJFS' permanent custody motion. This includes, for instance, the juvenile court's finding S.W. and Sh.W. were doing well and "have all of their regular and special needs met in their respective foster homes," one of which included an older sibling of S.W. and Sh.W. of whom PCJFS had already obtained permanent custody. This also includes the juvenile court finding S.W. and Sh.W. were "very bonded" to their foster families and that the children's respective foster homes were practically, if not literally, the

_____

7. For example, Father notes the juvenile court's finding that he and Mother had made "case plan progress" following a review hearing held on August 31, 2021. The juvenile court did, in fact, make such a finding. What Father fails to mention is that following the permanent custody hearing held on May 3, 2022, the juvenile court found that even though Mother had "accomplished more on her case plan," reunification was "still problematic" because Father "did not accomplish much." The juvenile court also found that most of what Father did accomplish on his case plan, i.e., basic drug, alcohol, and mental health treatment, occurred while he was in prison and that following his release from prison that Father "has not had any such treatment since." This is in addition to the juvenile court's finding that although Father had completed a basic parenting class, Father "does not know how to parent according to the caseworker," and that if Mother is unavailable, Father "would not show."

only homes they knew given the timing of their removal from Mother's and Father's care.

This is in addition to the juvenile court's finding, in pertinent part, the following:

> The children need stability and permanency that only permanent custody will provide. The children have special needs that the parents may have at least partially caused. The parents have not addressed their actions or inactions that are suspect and do not appear equipped to parent the children. The current foster families who wish to become adoptive families have discovered and met the children's basic and special needs (which has not been easy) and the children are stable, happy and provided for now and deserve to have that continue.

{¶ 26} "The decision to terminate a parent's parental rights requires serious consideration and should not be taken lightly." *In re L.H.*, 1st Dist. Hamilton No. C-220161, 2022-Ohio-2755, ¶ 53. This is because, in Ohio, the permanent termination of one's parental rights is likened to the family-law equivalent of the death penalty. *In re R.K.*, 152 Ohio St.3d 316, 2018-Ohio-23, ¶ 1, citing *In re D.A.*, 113 Ohio St.3d 88, 2007-Ohio-1105, ¶ 10; and *In re Hayes*, 79 Ohio St.3d 46, 48 (1997). However, after a thorough review of the record, we find the juvenile court's decision to grant permanent custody of S.W. and Sh.W. to PCJFS is supported by sufficient evidence and not against the manifest weight of the evidence. The juvenile court's decision was instead supported by the clear and convincing evidence presented at the final permanent custody hearing.

{¶ 27} In reaching this decision, we note the following statement set forth within the children's court appointed special advocate's final report submitted to the juvenile court:

> [Mother] and [Father] have demonstrated their lack of ability to follow through with the care required by these children. [S.W.] and [Sh.W.] are currently receiving excellent care in their foster homes. The bond between the boys and their foster families is very strong. * * * I believe it would be a huge mistake with lifelong consequences if these children were removed from these homes. They are in homes that meet their basic, safety, and special needs, along with being provided a very loving and stable family environment.

**{¶ 28}** We agree with the sentiments expressed by the children's court appointed special advocate and also note the well-established principle that "[a] child's life is not an experiment that can be left to chance." *In re G.W.*, 12th Dist. Butler No. CA2019-01-003, 2019-Ohio-1586, ¶ 52. That is, stated differently, "'[t]he law does not require the court to experiment with a child's welfare to see if the child will suffer great detriment or harm.'" (Internal brackets omitted.) *In re B.C.*, 12th Dist. Warren Nos. CA2018-03-024 and CA2018-03-027, 2018-Ohio-2673, ¶ 30, quoting *In re R.S.-G.*, 4th Dist. Athens No. 15CA2, 2015-Ohio-4245, ¶ 53. "The law instead requires the juvenile court act in a manner that, to the extent possible, serves the best interest of the child." *In re R.D.*, 12th Dist. Clermont Nos. CA2021-05-017 and CA2021-05-018, 2021-Ohio-3780, ¶ 39. "'A child's best interests are served by the child being placed in a permanent situation that fosters growth, stability, and security.'" *In re D.E.*, 12th Dist. Warren Nos. CA2018-03-035 and CA2018-04-038, 2018-Ohio-3341, ¶ 60, quoting *In re Keaton*, 4th Dist. Ross Nos. 04CA2785 and 04CA2788, 2004-Ohio-6210, ¶ 61. The juvenile court's decision to grant permanent custody of S.W. and Sh.W. to PCJFS does just that. Therefore, finding no merit to either of the two arguments raised by Father herein, Father's first issue presented for review lacks merit.

*Father's Second Issue Presented for Review*

**{¶ 29}** In his second issue presented for review, Father argues the juvenile court erred by granting permanent custody of S.W. and Sh.W. to PCJFS because there was no "good faith effort made at reunification" given that the children's court appointed special advocate did not "adequately investigate the case" and "no diligence was exercised" in investigating his and Mother's living situation. Father blames these supposed failures on PCJFS' prior involvement with him and Mother's three older children, K.W., D.S., and W.W., as well as the multitude of issues that arose during the COVID-19 pandemic. The record

does not support Father's argument. The record instead firmly establishes that any roadblock to reunification was the result of Mother's and Father's inaction and general noncommittal approach to what it would take to have S.W. and Sh.W. returned to their custody and care. To the extent Father claims otherwise, such argument lacks merit. To the extent Father may be arguing something else, such argument is not apparent and is otherwise not supported by any applicable legal citations or references to the record on appeal as required by App.R. 16(A)(7). Therefore, finding no merit to any of the arguments raised by Father herein, Father's second issue also lacks merit.

*Father's Third Issue Presented for Review*

{¶ 30} In his third issue presented for review, Father argues the juvenile court erred by denying his counsel's motion to continue the final permanent custody hearing when he failed to personally appear for that hearing. Father argues that decision violated his right to due process. However, as the record indicates, the juvenile court gave Father approximately three months' notice of when and where that hearing was to take place. The record also indicates that the juvenile court denied counsel's motion upon finding it did not believe Father would show if the matter was continued to a later date, and that there was likely no better chance that Father would appear if the hearing was continued to the next week, the next month, or even the next year. We find no error in the juvenile court's decision. We also find no merit to Father's claim that denying his counsel's motion to continue violated his right to due process. Father, although having received more than enough notice of when and where that hearing would take place, chose not to appear. Father made this choice of his own volition and not because of anything the juvenile court may or may not have done. Therefore, finding no merit to any of the arguments raised by Father herein, Father's third issue likewise lacks merit.

*Father's Single Assignment of Error is Overruled*

{¶ 31} For the reasons outlined above, and finding no merit to any of the three issues raised by Father, Father's single assignment of error lacks merit and is overruled.

**Mother's Assignment of Error No. 1:**

{¶ 32} THE AGENCY DID NOT ESTABLISH BY CLEAR AND CONVINCING EVIDENCE THERE WAS AN INCAPACITY ON THE PART OF [MOTHER] TO PROVIDE ADEQUATE PARENTAL CARE.

{¶ 33} In her first assignment of error, Mother argues the juvenile court erred by granting permanent custody of S.W. and Sh.W. to PCJFS. To support this argument, Mother claims the record does not contain clear and convincing evidence that she lacked the capacity to provide adequate parental care for the children. Mother's argument, although not particularly clear, is essentially a challenge to the juvenile court's decision finding neither S.W. nor Sh.W. could be placed with her and Father within a reasonable period of time or should not be placed with her and Father under R.C. 2151.414(B)(1)(a). We disagree.

{¶ 34} The second part of the two-part permanent custody test notes that an award of permanent custody can only be had where the juvenile court finds one of the circumstances set forth in R.C. 2151.414(B)(1)(a) to (e) applies. The juvenile court in this case found the circumstance set forth in R.C. 2151.414(B)(1)(a) applied to both S.W. and Sh.W. As noted above, that statute allows for an award of permanent custody where a child, who has not been in the temporary custody of the agency for at least 12 months of a consecutive 22-month period, and who has neither been abandoned nor orphaned, cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents. *See In re I.R.,* 12th Dist. No. Brown No. CA2022-02-001, 2023-

Ohio-1, ¶ 19, citing *In re C.B.*, 12th Dist. Clermont No. CA2015-04-033, 2015-Ohio-3709, ¶ 10 (describing under what circumstances R.C. 2151.414[B][1][a] applies in a permanent custody case).

**{¶ 35}** The juvenile court reached this decision upon finding that, notwithstanding reasonable case planning and diligent efforts by PCJFS, Mother and Father had "failed continuously and repeatedly to substantially remedy the conditions which caused the children to be removed." The juvenile court also found that, in addition to "financial concerns" and "marginal living arrangements" since PCJFS first became involved with Mother and Father several years prior regarding their three older children, K.W., D.S., and W.W., "[i]llegal drug use has either been the main reason for or connected to these children's removals and with the parents' other children being placed in the agency's permanent custody."

**{¶ 36}** The juvenile court further found that both S.W. and Sh.W. had "suffered various (and some serious) delays, apparently due to parental drug use," that Mother and Father had been "uncommitted to visiting the children (despite visitation being moved to accommodate the parents' schedule)," and that neither Mother nor Father had "made treatment a priority despite having five (5) children removed and being involved with the Agency." This was in addition to the juvenile court finding neither Mother nor Father were completely truthful when seeking the limited services that they did or, at the very least, that Mother and Father minimized the problems that they faced. Specifically, as the juvenile court found:

> It does not appear that either gave the entire picture when seeking the limited services they sought and/or they minimized the problems. Drug screen requests were ignored and home visits were made impossible by the parents. It appears that they even lied about their identities to authorities and hid inside their home on one occasion based upon the paternal grandfather

saying they were inside.

{¶ 37} We find no error in the juvenile court's decision. This is because, as a simple review of the record reveals, such findings are fully supported by the record. The juvenile court's decision is also not against the manifest weight of the evidence. This is particularly true in this case when considering neither Mother or Father appeared at the final permanent custody hearing to provide evidence contrary to the testimony and evidence offered by the five witnesses who testified in support of PCJFS' permanent custody motion. Therefore, because we can find no error in the juvenile court's decision finding S.W. and Sh.W. could not be placed with Mother and Father within a reasonable period of time or should be placed with Mother and Father under R.C. 2151.414(B)(1)(a), Mother's first assignment of error lacks merit and is overruled.

**Mother's Assignment of Error No. 2:**

{¶ 38} THE TRIAL COURT'S AWARDING OF CUSTODY OF S.W. AND SH.W. TO THE AGENCY IS NOT SUPPORTED BY CLEAR AND CONVINCING EVIDENCE.

{¶ 39} In her second assignment of error, Mother argues the juvenile court's decision finding it was in S.W.'s and Sh.W.'s best interest to grant permanent custody to PCJFS was not supported by clear and convincing evidence. However, given our resolution of Father's single assignment of error set forth above, Mother's argument challenging the juvenile court's best interest determination also lacks merit. In so holding, we reiterate our finding that the juvenile court's decision to grant permanent custody of S.W. and Sh.W. to PCJFS was supported by sufficient evidence and was not otherwise against the manifest weight of the evidence. Therefore, because we can find no error in the juvenile court's decision granting permanent custody of S.W. and Sh.W. to PCJFS, Mother's second assignment of error also lacks merit and is overruled.

**Conclusion**

{¶ 40} For the reasons outlined above, and finding no merit to any of the arguments raised by either Mother or Father herein, Mother's and Father's challenge to the juvenile court's decision granting permanent custody of S.W. and Sh.W. to PCJFS is overruled.

{¶ 41} Judgment affirmed.

HENDRICKSON and BYRNE, JJ., concur.