[Cite as *In re C.L.*, 2017-Ohio-7184.]

# IN THE COURT OF APPEALS

# FIRST APPELLATE DISTRICT OF OHIO

# HAMILTON COUNTY, OHIO

IN RE: C.L.                          :          APPEAL NO.  C-170169
                                                TRIAL NO.  F06-2680 Z
                                     :

                                     :          *O P I N I O N.*

Appeal From:  Hamilton County Juvenile Court

Judgment Appealed From Is:  Affirmed

Date of Judgment Entry on Appeal:  August 11, 2017

*Laursen & Lucas, Eric W. Laursen*, for Appellant Mother,

*Joseph T. Deters*, Hamilton County Prosecuting Attorney, and *Amanda Tholke*, Assistant Prosecuting Attorney, for Appellee Hamilton County Job and Family Services,

*Marjorie Davis*, Guardian ad Litem, for Appellee C.L.

**ZAYAS, Judge.**

{¶1}    C.L.'s mother appeals from the juvenile court's grant of permanent custody to Hamilton County Job and Family Services ("JFS").  Because we hold that the juvenile court did not err in its decision, we affirm its judgment.

### Background

{¶2}    C.L.'s mother has eight other children, all of whom have been removed from her care.  Three of these children were committed to the permanent custody of JFS, most recently in 2012.  Mother and father have a history of domestic violence, substance abuse, unstable housing and income, and mental-health issues. Mother and father also have a history of failing to comply with court-ordered case-plan services.

{¶3}    C.L. was born on July 16, 2014.  His meconium[1] tested positive for marijuana.   On July 23, 2014, JFS filed a complaint alleging that C.L. was a dependent child.   The magistrate denied JFS's motion for interim custody and returned C.L. to his parents.  On September 5, 2014, JFS filed an amended complaint alleging that the parents did not have proper supplies including a bed, a refrigerator, or stove; the child was observed to be small, lethargic, pale, and sickly; the child was diagnosed with failure to thrive; mother was not properly feeding the child; and mother's reports were inconsistent with the child's lack of weight gain and physical progress.   The magistrate held a hearing on September 5 and denied emergency custody to JFS, but upon review that same day, the trial court set aside the

---

[1] "A dark greenish mass that accumulates in the bowel during fetal life and is discharged shortly after birth."    Merriam-Webster, *Meconium*, https://www.merriam-webster.com/dictionary/meconium (accessed July 25, 2017).

magistrate's order and placed C.L. into the interim custody of JFS. C.L. was placed in foster care where he remains.

{¶4} On June 6, 2015, the magistrate held a hearing where C.L. was adjudicated to be a dependent child. On August 18, 2015, C.L. was placed into the temporary custody of JFS, and the first extension of temporary custody was also approved. On December 9, 2015, the magistrate granted the second extension of temporary custody. On May 27, 2016, JFS filed a motion to modify the temporary custody to permanent custody.

{¶5} On September 14, 2016, the magistrate held a trial on the motion for permanent custody. The magistrate heard testimony from Christopher Deering, Autumn Caldwell, and Jamie Baird, all visitation facilitators at the Family Nurturing Center ("FNC"). The magistrate also heard testimony from Josh Cupps, the family's JFS caseworker.

{¶6} Deering testified that he attended visitations with the family from November 2014 to October 2015. Father did not attend most of the visits. Deering testified that in the autumn of 2015, mother reported that she had broken her foot in a "slipping" accident. However, Deering suspected that the injury may have been related to domestic violence. Although JFS and FNC offered mother ride services so that she could attend the visits despite her injury, mother did not accept the ride services and began missing visits. Deering testified that when the mother's visits ceased, so did the father's, even though the father was not injured.

{¶7} Caldwell then testified that she attended two make-up visits with the family in September 2015. She testified that, before the second visit on September 22, 2015, began, she received a call from her supervisor, Zach Vargo, who told her that father had called him attempting to cancel mother's visits because father and

3

mother had broken up. Caldwell arrived early to the visit to discuss the situation with mother, and mother told Caldwell that the father was being physically and emotionally abusive. Though Caldwell and mother discussed shelter options, mother ultimately chose not to go to a shelter and returned to the apartment she shared with father. Baird testified that he attended visits with mother and C.L. between May 3, and May 31, 2016. He testified that mother attended only three visits out of a total of eight scheduled.

{¶8} Cupps testified that visits with the parents were going well until September 22, 2015, when father told Cupps that mother was a "bad mom" and that "[JFS] should take [C.L.]." After mother injured her foot, she told Cupps that neither she nor father would be able to attend visits due to her injury. He testified that mother and father did not request any visitation or make any contact with JFS between October 2015 and January 2016. He conceded that he had not personally observed any domestic violence in the family.

{¶9} Cupps further testified that there had been little to no "consistency and visitation and bonding with [C.L.], and seeing [C.L.] on a consistent basis" from the parents, and that this inconsistency had "thrown off the completion of some of the other services." He testified that he referred mother to Women Helping Women, but she did not attend any visits or assessments with them. He testified that mother was referred to Parent-Child Interaction Therapy in June 2016, and that she had made the first appointment but cancelled and rescheduled it twice. He testified that the parents completed the first phase of parenting classes, but the "domestic violence concerns" and mother's foot injury occurred prior to scheduling the second phase, and, as a result, the parents were never referred for the second phase. He testified that while father had been recommended to participate in individual and couples

4

therapy, he had not attended either because he did not think he needed therapy. Cupps testified that he had scheduled the family for four visits in April 2016 at JFS, but the parents had only attended the first of the four. He also scheduled five visits at JFS in August 2016, but the parents only attended the first of those five.

{¶10} Following the testimony, mother stipulated that she had had several conversations with Vargo about her options for going to a domestic-violence shelter. Father stipulated that he had told Vargo to cancel the visitation because of mother's extramarital affairs and told Vargo that it would be unsafe for visits to continue.

{¶11} Two exhibits were entered into evidence: mother's Diagnostic Assessment Form ("DAF"), and father's DAF and psychological evaluation. These assessments were completed in September 2014. Mother's DAF stated that father had gone to jail for domestic violence against her and one of their other children. It also noted that both parents had previously been recommended for mental-health treatment but "they have either refused to participate or compliance has been poor." Mother's DAF noted that

> [mother] sees herself as a responsible and caring parent even though she has not raised any of her nine children. She perceives that others are to blame for the children being removed from her care. She is reluctant to admit to any personal shortcomings or personal limitations when it comes to parenting * * * [and] sees little need for changes in her behavior.

{¶12} Father's psychological evaluation noted that he had not followed through with previous recommendations that he engage in therapy, and stated that his actions were consistent with a diagnosis of "Histrionic Personality Disorder." Father's DAF stated that the "primary concern" was father's "pattern of problematic

emotional regulation which seems to impact his interpersonal functioning, especially as he becomes angry or feels suspicious. He denied struggles with anger which leads to some question of his insight."

{¶13} On October 21, 2016, the magistrate issued a decision granting JFS's motion for permanent custody. The magistrate found that all of the elements of R.C. 2151.414(D)(2) applied in this case, and that therefore, the court must grant permanent custody to JFS. The magistrate also found that the condition in R.C. 2151.414(E)(11) was met in this case: the circumstances that had led to the parents' other children being removed were still present and the parents had failed to provide clear and convincing evidence that they could provide adequate care and a legally secure placement for the child. Mother filed objections on October 31, 2016. On January 23, 2017, the trial court heard oral argument regarding the objections, and issued an entry adopting the magistrate's decision on April 4, 2017.

{¶14} The trial court found that, although the parents had minimally attended some rehabilitative programs, they had not fully engaged or demonstrated any internalization of the programs' principles or methods. The trial court further found that neither parent recognized that a change of their current circumstances was necessary. The trial court agreed with the magistrate that neither parent proved by clear and convincing evidence that they could provide a legally secure permanent placement and adequate care for the health, welfare, and safety of the child.

{¶15} The mother timely appealed on April 18, 2017.

### Assignment of Error

{¶16} The mother's sole assignment of error is that the trial court erred when it granted permanent custody to JFS without a thorough analysis of all of the best interest factors under R.C. 2151.414(D)(1).

### *Standard of Review*

{¶17}   It is well-settled that parents who are suitable persons have a paramount right to the custody of their children. *In re Perales*, 52 Ohio St.2d 89, 97, 369 N.E.2d 1047 (1977).  "The fundamental interest of parents is not absolute, however." *In re D.A.*, 113 Ohio St.3d 88, 2007-Ohio-1105, 862 N.E.2d 829, ¶ 11.  In a custody determination, the best interest of the child controls.  *Id.*  A trial court's award of permanent custody must be supported by clear and convincing evidence, and we will not substitute our judgment for the trial court's when its decision is supported by competent, credible evidence.  *In re W.M.*, 1st Dist. Hamilton No. C-170003, 2017-Ohio-1398, ¶ 14.

{¶18}   R.C. 2151.414 governs the procedures that apply when a motion for permanent custody has been filed under R.C. 2151.413.  *Id.* at ¶ 15.  R.C. 2151.414 was modified in October of 2016, so we apply the version of the statute that was in effect on May 27, 2016, the date that JFS filed a motion to modify the temporary custody to permanent custody.  *See Id.*

{¶19}   Former R.C. 2151.414(B)(1) provided that "the court may grant permanent custody of a child to a movant if the court determines * * *, by clear and convincing evidence, that it is in the best interest of the child to grant permanent custody of the child to the agency that filed the motion for permanent custody and that [one] of [five conditions] appl[ies]."  One of these conditions was that, at the time the agency files the motion for permanent custody, "the child has been in the temporary custody of one or more public children services agencies * * * for twelve or more months of a consecutive twenty-two month period."  *In re W.W.*, 1st Dist. Hamilton Nos. C-110363 and C-110402, 2011-Ohio-4912, ¶ 49.

{¶20}   Former R.C. 2151.414(D)(2) provided that

[i]f all of the following apply, permanent custody is in the best interest of the child, and the court shall commit the child to the permanent custody of a public children services agency or private child placing agency:

(a) The court determines by clear and convincing evidence that one or more of the factors in division (E) of this section exist and the child cannot be placed with one of the child's parents within a reasonable time or should not be placed with either parent.

(b) The child has been in an agency's custody for two years or longer, and no longer qualifies for temporary custody pursuant to division (D) of section 2151.415 of the Revised Code.

(c) The child does not meet the requirements for a planned permanent living arrangement pursuant to division (A)(5) of section 2151.353 of the Revised Code.

(d) Prior to the dispositional hearing, no relative or other interested person has filed, or has been identified in, a motion for legal custody of the child.

With regard to former R.C. 2151.414(D)(2)(a)'s reference to the "division (E)" factors, factor (E)(11) is that

The parent has had parental rights involuntarily terminated with respect to a sibling of the child pursuant to this section or section 2151.353 or 2151.415 of the Revised Code * * * and the parent has failed to provide clear and convincing evidence to prove that, notwithstanding the prior termination, the parent can provide a legally

8

secure permanent placement and adequate care for the health, welfare, and safety of the child.

### The Trial Court Was Not Required to Weigh the "Best Interest" Factors of R.C. 2151.414(D)(1)(a)-(e)

{¶21} The trial court found that R.C. 2151.414(D)(2) controlled the outcome of this case. Mother's sole assignment of error contends that, even when R.C. 2151.414(D)(2) is used to determine the child's "best interest," there still must be a "best interest" analysis using the R.C. 2151.414(D)(1)(a)-(e) factors. However, "[i]f all of the R.C. 2151.414(D)(2) factors apply, 'then an award of permanent custody is in the child's best interest, and the trial court need not perform the weighing specified in division (D)(1).' " *In re S.S.*, 4th Dist. Jackson Nos. 16CA7 and 16CA8, 2017-Ohio-2938, ¶ 135, quoting *In re K.H.*, 2d Dist. Clark No. 2009-CA-80, 2010-Ohio-1609, ¶ 54. *See also In re N.K.*, 6th Dist. Sandusky Nos. S-14-040 and S-14-041, 2015-Ohio-1790, ¶ 70 ("The factors in R.C. 2151.414(D)(2) have been held to be an alternative to reaching the best interest determination through the factors in R.C. 2151.414(D)(1).").

{¶22} Though mother's assignment of error states that the trial court's "determination was not supported by the evidence," she does not explicitly contest the trial court's findings regarding the four R.C. 2151.414(D)(2) factors. The undisputed evidence established that C.L. "has been in an agency's custody for two years or longer, and no longer qualifies for temporary custody"; that he "does not meet the requirements for a planned permanent living arrangement"; and that "[p]rior to the dispositional hearing, no relative or other interested person has filed, or has been identified in, a motion for legal custody of the child." Therefore, the issue before the magistrate and trial court was whether one or more of the factors in

R.C. 2151.414(E) existed. *See In re C.M.*, 1st Dist. Hamilton Nos. C-150365 and C-150396, 2015-Ohio-3971, ¶ 16 (where there is no dispute that the other three (D)(2) factors are met, "[i]f at least one factor under division (E) exists, permanent custody must be granted to the agency").

{¶23} The trial court found that the condition in R.C. 2151.414(E)(11) existed: a sibling of the child had previously been removed from the parents and the parents had failed to provide clear and convincing evidence that they could provide a legally secure permanent placement and adequate care for the child's health, welfare, and safety. This finding was based on the fact that the parents had been inconsistent in their visitation, that they had failed to fully participate in the recommended services, and that the concerns regarding domestic violence appeared to still be present. The trial court was also concerned that the parents continued to lack the insight that their circumstances needed to change. The record reflects that competent, credible evidence supported these determinations, and we therefore overrule mother's assignment of error.

## Conclusion

{¶24} Because the trial court was not required to conduct a "best interest" analysis under R.C. 2151.414(D)(1), the trial court did not err, and we therefore affirm its judgment.

Judgment affirmed.

**CUNNINGHAM, P.J.,** and **MYERS, J.,** concur.

Please note:

 This court has recorded its own entry this date.