[Cite as *In re Z.J.*, 2023-Ohio-1347.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

| | | |
|---|---|---|
| IN RE: Z.J. | : | APPEAL NO. C-220627 |
| | | TRIAL NO. F-190156Z |
| | : | |
| | : | *O P I N I O N.* |

Appeal From: Hamilton County Juvenile Court

Judgment Appealed From Is: Affirmed

Date of Judgment Entry on Appeal: April 26, 2023

*Kimberly V. Thomas*, for Appellant Mother,

*Melissa Powers,* Hamilton County Prosecuting Attorney, and *Michelle Browning*, Assistant Prosecuting Attorney, for Appellee Hamilton County Department of Job and Family Services,

*Kathleen A. Kenney*,  for Appellee Guardian ad Litem.

**ZAYAS, Judge.**

{¶1} Mother appeals the trial court's award of permanent custody of Z.J. to the Hamilton County Department of Job and Family Services ("HCJFS"). For the following reasons, we affirm.

## I. Procedural History

{¶2} Mother appeals the termination of her parental rights by the trial court on November 23, 2022, which adopted the August 23, 2022 magistrate's decision.

{¶3} On June 10, 2020, HCJFS received a report that father had injured Z.J. by striking the child's genital area, leaving visible red marks. On June 12, 2020, HCJFS sought and was granted a telephonic ex parte emergency order of custody for Z.J. No safety plan could be authorized for father who was in treatment at the time for issues with maintaining sobriety, while mother was unavailable as she had suffered a seizure and had to be taken to the hospital.

{¶4} Therefore, on June 15, 2020, HCJFS sought and was granted temporary interim custody of Z.J. On September 10, the court found Z.J. to be dependent and granted temporary custody of Z.J. to HCJFS. From that point on, Z.J. has remained in the custody of HCJFS.

{¶5} On November 12, 2021, HCJFS filed a motion to modify temporary custody to permanent custody for Z.J. The permanent-custody trial was held before the magistrate on August 18, 2022. At the hearing, testimony was heard from the HCJFS caseworker assigned to the family, mother, mother's guardian, and Z.J.'s guardian ad litem ("GAL"). Considering this testimony and related evidence, the magistrate committed the child to the permanent custody of HCJFS on August 23, 2022.

{¶6} Mother filed timely objections to the magistrate's decision, and oral arguments were heard before the juvenile court on November 2, 2022. Mother objected

to the conclusion that Z.J. could not be returned to her within a reasonable time and that it was not in the best interest of Z.J. to return to mother's custody. Mother also objected to the magistrate's factual findings concerning her mental health, seizures, housing, and income.

{¶7} Ultimately, the juvenile court adopted the decision of the magistrate, issuing a decision on November 23, 2022, that granted permanent custody of Z.J. to HCJFS and terminated the parental rights of mother and father. Mother filed a timely appeal to this court. Notably, father neither filed objections nor an appeal in this case. He has not had contact with HCJFS or appeared at proceedings for years.

## II.    Background Facts

### A. Testimony of HCJFS Caseworker at Magistrate's Hearing

{¶8} Kayla Petrosky is currently an ongoing supervisor with HCJFS and serves as the caseworker in Z.J.'s case. Although the case has been open since 2018, she received responsibility for it as of December 2020. At the time, Z.J. was five years old. Petrosky testified that in December 2020, she first had a meeting with mother where she introduced herself as the new caseworker. However, the discussion was not able to continue as mother had a seizure several minutes into the meeting. Petrosky called paramedics who transported mother to the hospital. Since that initial meeting, all contacts have been via phone because mother left Ohio, moving initially to Chicago and eventually to Las Vegas where she currently resides. Petrosky indicated that she speaks with mother on the phone at least once a month.

{¶9} When mother still lived in Ohio, she had weekly, in-person visitation with Z.J. However, since mother's move, the visits have transitioned to weekly phone calls facilitated by JusticeWorks. Mother has not seen Z.J. since she moved from Ohio, but speaks with the child every week on their calls. Petrosky stated that the relationship

between mother and Z.J. "obviously has deteriorated somewhat over the last several years since [Z.J.] hasn't been able to see her." In addition, Petrosky raised concern that mother's recent interactions with Z.J. on calls have been negative and critical, leading to Z.J. experiencing increased anxiety surrounding the calls. Petrosky also stated that mother "definitely does have strengths" as a parent.

{¶10} Currently, Z.J. is in a foster home, where Petrosky visits the child once a month. According to Petrosky's testimony, Z.J. is "extremely bonded with [the] foster parents, [and] with the other kiddos that are in the home. [Z.J.] is doing extremely well." According to Petrosky, Z.J. enjoys joking and playing with the foster siblings. Further, Petrosky testified that the foster family has an interest in adopting Z.J.

{¶11} When asked during both direct and cross-examination, Petrosky expressed that she believes that it is in the best interest of Z.J. to be placed in the permanent custody of HCJFS due to concerns with mother's mental health, seizures, and housing stability.

{¶12} Throughout her testimony, Petrosky was asked to speak to mother's mental health several times. When Petrosky first took over the case in 2020, mother was engaging with Talbert House for case-management services and therapy. In addition, mother had just recently completed a diagnostic assessment through Family Access Integrated Recovery which stated that the diagnostic impression for mother was "depressive disorder, schizo-affective disorder, delusional disorder, and paranoia personality disorder." The diagnostic assessment recommended therapy as well as medication to help mother regulate her mental health, and a psychological evaluation for mother was scheduled. However, the psychological evaluation was not completed because mother moved out of Ohio, and mother has not provided any evidence of treatment or medication for her mental health. According to Petrosky, "Mother has repeatedly told me that she's not engaged in any sort of therapy services, medication

management through a mental health provider, or case management services." Petrosky further testified that mother's mental-health concerns, particularly her paranoia, have manifested in ways that have negatively affected Z.J., such as instances where mother believed Z.J. was being harmed in ways that were not true.

**{¶13}** In reference to her seizures, Petrosky stated that mother has sought treatment from a neurologist in Nevada. Mother has also reported to Petrosky that she is taking some medication, but Petrosky noted that she did not provide clarity on what medications she was taking. While there has been some indication that mother's seizures have decreased in regularity since receiving this treatment, HCJFS still has concerns about whether another adult will be present to take care of Z.J. when mother suffers a seizure. While grandmother living with mother could potentially alleviate these concerns, Petrosky noted that "JFS would have to assess Maternal Grandmother, which would be part of the ICPC process." However, the ICPC plan was denied in this case because mother was not engaging in any case-plan services.[1] When asked about the case plan, Petrosky testified that she has had several conversations with mother about the importance of completing case-plan services.

**{¶14}** Regarding mother's housing, Petrosky testified that mother has not demonstrated that she currently has stable housing in accordance with the case plan. When asked about her housing, mother has refused to provide an address on all but one occasion. When an address was provided, the residence was an extended-stay hotel where mother lived with grandmother. Petrosky noted that she has not been able to evaluate any other housing as this is the only address that has been provided.

---

[1] The Interstate Compact on the Placement of Children ("ICPC") is a statutory law in all 50 states and is designed to ensure that children placed across state lines will be placed in a safe, suitable environment and with persons or in institutions qualified to care for the child. ICPC authorizes the placement of any child into or from Ohio.

{¶15} While Petrosky's testimony with respect to father is mostly unrelated to mother's current appeal, Petrosky did testify that father has not attempted to contact or visit Z.J. in the past 90 days. In addition, by the time Petrosky took over the case, father no longer had contact with HCJFS.

## B. Testimony of Mother at Magistrate's Hearing

{¶16} At the magistrate's hearing, mother provided testimony on her housing, her relationship to Z.J., her mental health, and her seizures. Mother was first asked about her housing situation. In response, she indicated that she currently lives in a one-bedroom apartment with Z.J.'s grandmother and confirmed that she has not provided an updated address to HCJFS. Mother stated that she is sleeping on the couch, and while she does not currently have a bed for Z.J., she would purchase one. Further, mother testified that grandmother could help to care for Z.J. as she does not have a busy daily schedule. When asked about her income, mother stated that she receives disability and has sufficient income to support Z.J.

{¶17} Mother also testified about her relationship with Z.J., stating that she speaks with Z.J. on the phone weekly for approximately a half-hour, although the conversations can be shorter because Z.J. does not like talking on the phone. Mother stated that they talk about "everything" and that Z.J. is a "comedian" who "lifts up [her] spirit." Ultimately, when asked if she feels bonded to Z.J., mother responded, "Yes. That's my baby."

{¶18} When asked about whether she currently participates in any services related to her mental health, mother responded that she went to a Nevada treatment center where she participated in a psychological evaluation and a counseling session to review her evaluation. According to mother's testimony, her counselor indicated that her "evaluation was good" and that "everything was under control." When asked about this

6

appointment, mother stated that she had not received any report or documentation from it and had not told Petrosky about it.  Further, she testified that she "really didn't" speak with the counselor about her goals of treatment but did express that she wanted to be reunited with Z.J. and to strengthen her faith.  Mother also said that she planned to attend another appointment the following month.  However, when mother was questioned about her mental health during direct examination, she asked, "Why do you all keep bringing up this mental health when I don't have mental health issues?"  She went on to state that her mental health is stable and reiterated that "I'm fine now. It's just an excuse to take [Z.J.].  That's all that is."

{¶19}  When asked about her seizures, mother testified that she believes that she currently takes three medications prescribed by her neurologist for treatment.  Mother testified that this medication has helped with her seizures.  However, mother's testimony provides some contradictions regarding the timing of her last seizure and the new medicine she was prescribed.

Q: [Mother], you had testified that you had a seizure two to three months ago. Was this seizure on your new medication.

A: No.

Q: Okay. So this was on a previous medication that you were taking?

A: Uh-huh.

Q: And on this new medication, you have not had any seizures  at all on this new medication?

A: No.

Q: Okay. Have you ever reported that you had a seizure on this new medication?

A: I believe so. I don't know.

Q: Okay.

A: I'm not too sure.

**{¶20}** When asked about father, mother stated that she ended her relationship with him in January 2021 due to the inappropriate contact that he had with Z.J. Mother stated that father was the reason for Z.J.'s initial removal from their custody and not her seizures.

**{¶21}** Finally, mother's attorney asked if she had anything else that she wanted to express regarding why Z.J. should be placed in her care:

Q: Okay. And any other reasons that you want to explain to the Court why

it's in the best interest – that you feel it's in the best interest for [Z.J.] to be

placed in your custody?

A: It's my son. I shouldn't have no reason to explain.

## C. Closing Statements by GAL for Mother and GAL for Z.J. at Magistrate's Hearing

**{¶22}** During closing statements, attorneys for HCJFS and mother spoke and made arguments for their recommendation regarding custody. Additionally, the GAL for mother and the GAL for Z.J. also spoke on the matter. The GAL on behalf of mother stated the following:

There's no question that Mother loves her child, [Z.J.]. There's no question

she's trying to do the best that she can. There's no question that she moved

out of Cincinnati to better herself, but there are other questions that are

not answered, Your Honor, and the question that I'm most concerned

about, as her guardian, is her mental health.

**{¶23}** The GAL went on to testify that despite "a significant diagnostic impression from the [psychological assessment]," mother denies having mental-health concerns and

characterizes them as a way to take her child. Ultimately, the GAL for mother concluded that even though mother had improved herself, it was not in the best interest of the child to be given to her care.

{¶24} The GAL for Z.J. also spoke during closing statements, expressing similar concerns about mother and recommending permanent custody to HCJFS. The GAL also added that Z.J. had expressed a desire to remain in the foster home and be adopted by that family. According to the GAL, Z.J. has remained in the same foster home for the duration of this case and has strongly bonded with the foster family.

### III.    Assignment of Error

{¶25}    Mother presents one assignment of error for review: "The Juvenile Court erred and abused its discretion in finding that the child cannot be placed with either parent within a reasonable period of time or should not be placed with the parents and that permanent custody was in the best interest of the child when that finding was not supported by sufficient evidence and was against the manifest weight of the evidence."

### IV.    Law and Analysis

#### A. Standard of Review

{¶26}    A juvenile court's award of permanent custody must be supported by clear and convincing evidence, and the appellate court should not substitute its judgment for the trial court's when its decision is supported by competent, credible evidence. *In re C.L.*, 1st Dist. Hamilton No. C-170169, 2017-Ohio-7184, ¶ 17, citing *In re W.M.*, 1st Dist. Hamilton No. C-170003, 2017-Ohio-1398. ¶ 14. Clear and convincing evidence "is evidence sufficient to 'produce in the mind of the trier of fact[ ] a firm belief or conviction as to the facts sought to be established.' " *In re W.W.*, 1st Dist. Hamilton Nos. C-110363 and C-110402, 2011-Ohio-4912, ¶ 46, quoting *In re K.H.*, 119 Ohio St.3d 538, 2008-Ohio-4825, 895 N.E.2d 809, ¶ 42. When reviewing a challenge to the manifest weight of the

evidence, we must review the record to determine whether the trial court lost its way and committed such a manifest miscarriage of justice that its judgment must be reversed. *Id.*

**{¶27}** In performing this analysis, the appellate court reviews whether sufficient evidence supports the decision of the lower court. "Our review for sufficiency asks whether some evidence exists on each element. It is a test of adequacy, and whether the evidence is sufficient to sustain the judgment is a question of law." *In re D.M.*, 1st Dist. Hamilton No. C-200043, 2020-Ohio-3273, ¶ 21, citing *In re A.B.*, 1st Dist. Hamilton No. C-130401, 2013-Ohio-4460, ¶ 15.

### B. Two-Prong Test for Granting Permanent Custody

**{¶28}** Under R.C. 2151.414(B), the juvenile court may grant a motion for permanent custody if it finds by clear and convincing evidence that (1) permanent custody is in the best interest of the child, and (2) that one of the five factors set forth in R.C. 2151.414(B)(1) applies. One of these five factors is satisfied when the court determines that "[t]he child had been in the temporary custody of one or more public children services agencies * * * for twelve or more months of a consecutive twenty-two-month period * * *." R.C. 2151.414(B)(1)(d).

### C. 12 Months of a 22-Month Period

**{¶29}** For the purposes of R.C. 2151.414(B)(1), "a child shall be considered to have entered the temporary custody of an agency on the earlier of the date the child is adjudicated pursuant to section 2151.28 of the Revised Code or the date that is sixty days after the removal of the child from home." R.C. 2151.414(B)(1).

**{¶30}** In the present case, the earlier of the two dates referenced in R.C. 2151.414(B)(1) is August 14, 2020, 60 days after the removal of the child from the home. Therefore, when the permanent-custody motion was filed on November 21, 2021, Z.J. had been in the temporary custody of HCJFS for over 15 months. Further, mother does not

contest that Z.J. was in the temporary custody of HCJFS for 12 or more months of a consecutive 22-month period. As there is no dispute regarding R.C. 2151.414(B)(1)(d), and the record is clear that the child was in the custody of HCJFS for more than 12 months of a consecutive 22-month period, the trial court correctly determined that this prong of the analysis had been satisfied.

{¶31} Therefore, the remaining test centers on whether the trial court properly applied the best-interest factors. Mother argues that the evidence presented did not support the determination that a grant of permanent custody was in Z.J.'s best interest.

### D. Best-Interest Factors and Analysis

{¶32} Under R.C. 2151.414(D)(1), the court shall consider all relevant factors in determining the best interest of the child at a hearing, including, but not limited to, the following:

(a) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;

(b) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;

(c) The custodial history of the child, including whether the child has been in the temporary custody of one or more children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two month period, * * *;

(d) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;

(e) Whether any of the factors in divisions (E)(7) to (11) of this section apply

in relation to the parents and child.

**{¶33}** In considering these factors, "[n]o single factor is given greater weight or heightened significance." *In re D.M.*, 1st Dist. Hamilton No. C-200043, 2020-Ohio-3273, ¶ 47, citing *In re C.F.*, 113 Ohio St.3d 73, 2007-Ohio-1104, 862 N.E.2d 816, ¶ 57.

**{¶34}** Mother argues that the juvenile court "made little mention of the best interest factors." However, mother's argument that "the Juvenile Court barely touches on the best interest factors" in its decision is inconsistent with the court's entry. In its decision, the juvenile court expressly addressed each of the best-interest factors contained in R.C. 2151.414(D)(1), providing references to relevant evidence and associated reasoning. In addition, the magistrate's decision was exceptionally thorough, laying out all relevant facts, findings of fact, and reasoning.

**{¶35}** The juvenile court made the following findings with respect to the best-interest factors under R.C. 2151.414(D)(1):

### i. *Best-Interest Factor R.C. 2151.414(D)(1)(a)*

**{¶36}** Under R.C. 2151.414(D)(1)(a), the trial court considered Z.J.'s relationships with mother, father, and the foster family. Although mother has not seen Z.J. in person since she moved away from Ohio in 2020, she speaks with Z.J. on the phone four times a month. The HCJFS caseworker testified that mother has been critical of Z.J. during calls, which has made Z.J. anxious about participating in more calls. However, mother testified that she feels bonded to Z.J. and spoke about how Z.J. lifts her spirits on these calls.

**{¶37}** The trial court found that father has a history of aggressive behavior towards Z.J. and has had no contact with Z.J. since early 2020.

**{¶38}** The trial court also found that Z.J. currently lives with a foster family where Z.J. has bonded with the foster parents and siblings.

### ii. *Best-Interest Factor R.C. 2151.414(D)(1)(b)*

{¶39}   Under R.C. 2151.414(D)(1)(b), the trial court considered the wishes of the child.  In the GAL's permanent-custody report and recommendation, the GAL noted that Z.J. wishes to live with the foster family.

### iii. *Best-Interest Factor R.C. 2151.414(D)(1)(c)*

{¶40}   Under R.C. 2151.414(D)(1)(c), the trial court considered whether Z.J. has been in the temporary custody of HCJFS for 12 or more months of a consecutive 22-month period.  The trial court found that, when the permanent-custody motion was filed, Z.J. had been in the temporary custody of HCJFS for over 15 months.

### iv. *Best-Interest Factor R.C. 2151.414(D)(1)(d)*

{¶41}   Under R.C. 2151.414(D)(1)(d), the trial court considered Z.J.'s need for a legally secure permanent placement and determined whether this could be achieved without a grant of permanent custody to HCJFS.  According to the trial court, the evidence provided was "compelling to find that parents have not remedied the conditions which led to the removal of [Z.J.] from their care."

{¶42}   The trial court attributed this finding to a variety of factors.  Mother still has ongoing physical and mental-health concerns and has stopped engaging in case-plan services since she moved out of Ohio in 2020.  Further, concerns remain regarding mother's housing and income.  Mother underwent an ICPC, but failed when it was revealed that she and maternal grandmother were living in an extended-stay hotel.  At trial, mother refused to provide any new information about her residence or income besides stating that she receives social security.  Finally, the trial court noted that there are ongoing concerns that mother is still experiencing seizures.

**{¶43}** According to the trial court's findings, father is unable to provide a legally secure placement for Z.J. as he has not had contact with Z.J. since 2020. The trial court found that father has abandoned Z.J.

### v. *Best-Interest Factor R.C. 2151.414(D)(1)(e)*

**{¶44}** Under R.C. 2151.414(D)(1)(e), the trial court considered whether any of the other statutory factors apply to the relationship between the parents and Z.J. No evidence was presented that this factor was applicable to mother or Z.J. However, the trial court found that father has abandoned Z.J. under R.C. 2151.414(E)(10).

**{¶45}** Based on the above best-interest analysis, the trial court found that it was not in the best interest of Z.J. to be placed with mother or father. Mother's argument that the trial court did not address the best-interest factors is not persuasive given the record.

### E. Appellate Review of the Juvenile Court's Best-Interest Determination

**{¶46}** Mother contests the best-interest analysis, focusing on and disputing factual findings related to R.C. 2151.414(D)(1)(d), which considers Z.J.'s need for a legally secure permanent placement. Notably, a legally secure permanent placement " 'is more than a house with four walls. Rather, it generally encompasses a stable environment where a child will live in safety with one or more dependable adults who will provide for the child's needs.' " *In re A.H.*, 1st Dist. Hamilton Nos. C-200065 and C-200086, 2020-Ohio-3102, ¶ 33, quoting *In re P. & H.*, 1st Dist. Hamilton Nos. C-190309 and C-190310, 2019-Ohio-3637, ¶ 42; *see In re K.M.*, 10th Dist. Franklin Nos. 15AP-64 and 15AP-66, 2015-Ohio-4682, ¶ 28 (observing that legally secure permanent placement requires more than stable home and income but also requires environment that will provide for child's needs).

**{¶47}** A review of the record shows that the juvenile court's analysis of Z.J.'s need for a legally secure permanent placement was supported by competent, credible evidence.

*See In re C.L.*, 1st Dist. Hamilton No. C-170169, 2017-Ohio-7184, at ¶ 17, citing *In re W.M.*, 1st Dist. Hamilton No. C-170003, 2017-Ohio-1398, at ¶ 14 (holding that an appellate court "will not substitute our judgment for the trial court's when its decision is supported by competent, credible evidence"). A significant amount of testimony and evidence was presented concerning mother's mental health. The latest diagnostic impression for mother under her diagnostic assessment was depressive disorder, schizo-affective disorder, delusional disorder, and paranoia personality disorder. In addition, the HCJFS caseworker assigned to the family testified that mother "has repeatedly told me that she's not engaged in any sort of therapy services, medication management through a mental health provider, or case management services." Mother stated during her own testimony that she did not have any mental-health concerns and that they were just excuses to take Z.J. from her. Mother did testify that she has attended a psychological evaluation and counseling session recently, although she did not discuss mental-health goals with her counselor.

{¶48} Concerning her seizures, mother testified that she has seen a neurologist who had prescribed her three medications for treatment. Subsequently, her seizures were occurring less frequently. However, the caseworker expressed concerns about Z.J.'s care if mother experienced a seizure, regardless of their frequency. While mother testified that grandmother could provide assistance, she was hesitant to provide information on grandmother's schedule beyond stating that she would be available to help. Further, HCJFS has not been able to assess grandmother as part of the ICPC process because mother has not progressed with her case plan. While mother's seizures were considered, they were not a determinative factor in the permanent-custody determination. Notably, the caseworker's concern related to mother's seizures was not linked to her medical condition but rather arose out of mother's availability to care for a young child. This

15

inquiry is extremely fact specific, as seizures alone do not automatically make a person unable to care for a child. *Friedenberg v. Friedenberg*, 11th Dist. Lake No. 2017-L-149, 2019-Ohio-325, ¶ 30 (holding that a parent's mental and physical condition is relevant only as it relates to his or her ability to parent the child). Therefore, it cannot be said that the trial court inappropriately considered and weighed evidence regarding mother's seizures.

{¶49} Finally, with respect to her housing and income, mother presented limited testimony. Regarding her income, mother only said that she receives disability and has sufficient funds to care for Z.J. Mother did testify that she now lives in a one-bedroom apartment with grandmother. However, mother acknowledged that she has not provided an updated address. She also testified that Z.J. does not currently have a bed in the apartment, but that she would purchase one for Z.J. if her child came to live with her. According to the caseworker's testimony, the only address mother has provided since moving from Ohio is for an extended-stay hotel. Additionally, an ICPC to evaluate the housing situation was denied due to lack of progress on a case plan. Therefore, while mother testified to an improved housing situation, she has not provided an address or any means of evaluating her housing or income.

{¶50} Overall, mother's testimony established that she has worked to improve her situation. However, the trial court's best-interest determinations are supported by sufficient evidence, and we cannot find that the trial court lost its way and committed such a manifest miscarriage of justice that its judgment must be reversed. Therefore, the trial court did not err in overruling mother's objection to the magistrate's decision and awarding permanent custody of Z.J. to HCJFS.

## V. Conclusion

**{¶51}** In conclusion, we overrule mother's sole assignment of error and affirm the judgment of the juvenile court.

Judgment affirmed.

**CROUSE, P.J.,** and **KINSLEY, J.,** concur.

Please Note:

The court has recorded its own entry this date.