[Cite as *In re N.G.*, 2024-Ohio-31.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

CLINTON COUNTY


|  |  |  |
|---|---|---|
| IN RE: | : | |
| N.G., JR., et al. | : | CASE NOS. CA2023-06-013<br>CA2023-06-014 |
| | : | |
| | : | O P I N I O N<br>1/8/2024 |
| | : | |
| | : | |


APPEAL FROM CLINTON COUNTY COURT OF COMMON PLEAS
JUVENILE DIVISION
Case Nos. 20213001 & 20213002


Anne Harvey, for appellant.

Andrew T. McCoy, Clinton County Prosecuting Attorney, and Danielle E. Sollars, Assistant Prosecuting Attorney, for appellee, Clermont County Children Services.


**PIPER, J.**

{¶ 1} Appellant ("Mother") appeals the decision of the Clinton County Court of Common Pleas, Juvenile Division, granting permanent custody of her two sons, N.G., Jr. and N.G., to appellee, Clinton County Children Services ("CCCS").

**The Parties**

{¶ 2} This case involves the juvenile court's grant of permanent custody of the two-above-named children, boys, N.G., Jr., born on March 20, 2012, and N.G., born on April 4, 2013. The children's father is not a party to this appeal and has been found to have abandoned the children. As set forth within her brief, Mother is an admitted alcoholic and self-proclaimed "occasional" drug user who has been diagnosed with substance use disorder, major depressive disorder, and ADHD. The record indicates that Mother also admitted to using methamphetamine on the day the children were removed from her care, as well as acknowledging that the children were nearby sleeping when she and a former boyfriend got into a physical altercation that resulted in Mother being set on fire.

**Facts and Procedural History**

{¶ 3} On January 20, 2021, CCCS filed complaints alleging the children were abused, neglected, and dependent. CCCS filed its complaints shortly after receiving reports of domestic violence in the home and claims that children were "observed playing with a knife unsupervised by the mother and that both children were not attending school." This was in addition to CCCS receiving reports that the children were at risk of sexual abuse by a resident in the campground where they were living "who was sexually abusing children there," as well as allegations that the children were seen "filthy and running around the campground barefoot in the cold weather."

{¶ 4} These reports led to a CCCS caseworker making several visits to the camper where Mother was believed to be living with the children and her various paramours. During each of these visits, the children were either outside unsupervised or in other resident's campers, whereas Mother was inside the family's own camper oftentimes with the door

locked.[1]  This included one visit where N.G., Jr. was "locked inside another camper and could not figure out how to unlock the door.  He was distressed, crying and yelling that he wanted out" while N.G. was "running around laughing and unconcerned about his brother."  These reports, coupled with CCCS' investigation into said reports, ultimately resulted in the children being removed from Mother's care and placed in CCCS' temporary emergency custody on January 14, 2021.

{¶ 5}  On March 15, 2021, the juvenile court issued a decision adjudicating the children as dependent.  The following month, on April 19, 2021, the juvenile court issued a dispositional decision granting temporary custody of the children to CCCS.  The juvenile court also approved and journalized a case plan that CCCS had established for Mother.  The case plan required Mother to, among other things, address her substance abuse and mental health issues, as well as to obtain and maintain employment and suitable housing for herself and the children.

{¶ 6}  The following year, on October 17, 2022, CCCS moved for permanent custody of the children.  To support its permanent custody motion, CCCS argued that, even though Mother had engaged in some of her case plan services, its concerns as to whether Mother would be able to provide appropriate housing and care for the children remained.  Therefore, given the ongoing concerns surrounding Mother and the children at that time, and considering it had been nearly two years since the children had been removed from Mother's care, CCCS argued that "it does not appear that [Mother] will be able to provide appropriate housing or provide for the various needs of the children within a reasonable

---

1. The record contains several photographs of this camper.  This camper, if that is the right term to use to describe this structure, was in disastrous condition and appeared uninhabitable by any single person, let alone a mother with two young children.  Mother later acknowledged that the outside of the camper "looks deplorable" and agreed that the camper's condition made it unlivable given the holes in the roof, and heaps of trash, broken glass, and animal feces strewn throughout the campsite where the camper was located.

period of time."

{¶ 7} On February 16, 2023, the juvenile court conducted individual in camera interviews of both children. These individual in camera interviews were done at Mother's request and pursuant to the motion Mother filed with the juvenile court on January 19, 2023. The following month, on March 14 and 17, 2023, the juvenile court held a two-day hearing on CCCS' motion for permanent custody. During this hearing, the juvenile court heard testimony from a total of nine witnesses. This included testimony from CCCS' investigative supervisor, a CCCS ongoing supervisor, and the ongoing caseworker with CCCS assigned to the children's cases. This also included testimony from both of the children's respective counselors, N.G.'s foster-mother, and Mother.

{¶ 8} As part of her testimony, Mother acknowledged that her drug and alcohol use had impacted her ability to properly parent the children. Specifically, Mother testified, "[a]t the time, I was – I mean, I was lacking sleep. I was having – I was overwhelmed and I just I wasn't being the best mom." Mother also admitted that, for over a year after the children were removed from her care, she had not engaged in any of her case plan services and that she was "using" drugs during that time. This is in addition to Mother admitting that she had been incarcerated during a large portion of this case for violating her probation, which had been imposed for a prior OVI conviction out of Hamilton County, Ohio.

{¶ 9} The juvenile court also received a report from the children's guardian ad litem during this hearing that recommended the court grant CCCS' permanent custody motion. Within this report, the guardian ad litem stated the following as it relates to the circumstances that initially led to the children's removal from Mother's care:

> At the beginning of the case, the Mother resided at a trailer park [in] Clinton County with various paramours and her two youngest children, [N.G., Jr. and N.G.] She abused illicit drugs (methamphetamine), alcohol, and purportedly engaged in

sexual behavior while in the presence of the two little boys. The two boys were physically abused by their mother as well as by [her] various paramours. They were not fed properly. There have been disclosures of sexual abuse upon both boys by a resident of the trailer park, and additional disclosures that [N.G.] has been victim of sexual abuse by his brother, [N.G., Jr.] At times they lived in filth with disclosures of roaches and other "bugs." At the time of this GAL's appointment, the Mother was serving time in the Hamilton County Jail.

{¶ 10} The guardian ad litem also stated in regard to the wishes expressed by both children to her and to the juvenile court during the court's recent individual in camera interviews with the children:

The GAL has spoken with [N.G.] twice and [N.G., Jr.] once. Furthermore, she participated in the In Camera Interview of both boys conducted on February 16, 2023.

Both boys expressed a desire never to be reunited with [Mother]. They both claim they are glad Mother is doing "better," but there is a horrible lack of trust created by years of abuse and neglect. [N.G., Jr.] expressed a possible desire to visit with his Mother IF SUPERVISED, and [N.G.] has no desire to ever see her again.

While interviewed individually in chambers, both boys were consistent with the above. Both were able to independently voice their specific concerns regarding reasons for their positions. Each was able to recall many of the specific incidents which form the basis of their positions, anger, and inability to deal with [Mother]. And in as much as they have not seen each other for months and were incapable of coaching each other on their answers, the GAL found them to be intelligent and truthful in their responses to [the juvenile court].

{¶ 11} On May 8, 2023, the juvenile court issued a decision granting CCCS' motion for permanent custody. In so doing, the juvenile court found the children had been in the temporary custody of CCCS for at least 12 months of a consecutive 22-month period. The juvenile court also found that, although Mother had made some "limited progress" on her case plan services, Mother's ongoing recovery from her substance abuse and mental health issues is "a long-term process" that she will need time to complete, during which the children

"cannot remain in limbo." The juvenile court noted that this was particularly concerning in this case given Mother's "past history is that of relapsing." The juvenile court further found that, throughout the pendency of this case, Mother had failed to maintain consistent employment "or to show other means available to support her children," failed to obtain appropriate housing for the children, had not consistently visited with the children having attended just 20 of the possible 51 visits, and failed to obtain "appropriate childcare for her children considering their specialized needs and trauma related issues."

{¶ 12} The juvenile court additionally found Mother had not shown that "the children would be properly supervised in the sober living housing when [she] has work responsibilities." This is in addition to the juvenile court finding Mother had "a history of associating with persons that would be inappropriate for the children to have contact with" and that the children had been "traumatized" by Mother's actions while in her care. The juvenile court lastly noted, similar to what the children's guardian ad litem stated within her report and recommendation, that both children, who at the time of their individual in camera interviews were ages nine and ten, had expressed their wishes not to visit, reside, or reunify with Mother ever again. Given these findings, the juvenile court concluded that granting CCCS' motion for permanent custody was in the children's best interest.

**Mother's Appeal and Single Assignment of Error for Review**

{¶ 13} Mother filed a timely notice of appeal from the juvenile court's decision on June 6, 2023. Mother's appeal now properly before this court for decision, Mother has raised one assignment of error for review. In her single assignment of error, Mother argues the juvenile court's decision to grant permanent custody of the children to CCCS was not supported by sufficient evidence and was against the manifest weight of the evidence. We disagree with both of Mother's claims.

*Sufficiency and Manifest Weight of the Evidence Standards*

{¶ 14} "An appellate court's review of a juvenile court's decision granting permanent custody is generally limited to considering whether sufficient credible evidence exists to support the juvenile court's determination." *In re D.P.*, 12th Dist. Butler No. CA2020-07-074, 2020-Ohio-6663, ¶ 13. "That is to say, the juvenile court's decision to grant permanent custody must be supported by sufficient evidence." *In re P.E.*, 12th Dist. Clermont No. CA2023-04-021, 2023-Ohio-2438, ¶ 14. Sufficiency of the evidence is a test of adequacy, i.e., the burden of production. *In re J.E.*, 12th Dist. Fayette No. CA2023-08-013, 2023-Ohio-3827, ¶ 10, citing *In re L.C.*, 5th Dist. Stark No. 2023CA0043, 2023-Ohio-2989, ¶ 16. "[W]hether the evidence is sufficient to sustain the judgment is a question of law." *In re Z.J.*, 1st Dist. Hamilton No. C-220627, 2023-Ohio-1347, ¶ 27.

{¶ 15} Questions of law, even in permanent custody cases, are reviewed by this court de novo. *In re S.C.-N.*, 10th Dist. Franklin No. 21AP-544, 2022-Ohio-3064, ¶ 55. In conducting a de novo review, this court independently reviews the record without giving deference to the juvenile court's decision. *In re S.C.R.*, 12th Dist. Clinton No. CA2017-11-018, 2018-Ohio-4063, ¶ 13. "However, even if the juvenile court's decision is supported by sufficient evidence, 'an appellate court may nevertheless conclude that the judgment is against the manifest weight of the evidence.'" *In re C.S.*, 12th Dist. Clinton No. CA2020-04-006, 2020-Ohio-4414, ¶ 15, quoting *In re T.P.*, 12th Dist. Butler No. CA2015-08-164, 2016-Ohio-72, ¶ 19.

{¶ 16} "Manifest weight tests the burden of persuasion, not the burden of production." *Magnum Steel & Trading, LLC v. Mink*, 9th Dist. Summit Nos. 26127 and 26231, 2013-Ohio-2431, ¶ 31. In determining whether a juvenile court's permanent custody decision is against the manifest weight of the evidence, this court "'weighs the evidence and

all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the finder of fact clearly lost its way and created such a manifest miscarriage of justice that the judgment must be reversed and a new trial ordered.'" *In re S.M.*, 12th Dist. Warren Nos. CA2018-08-088 thru CA2018-08-091 and CA2018-08-095 thru CA2018-08-097, 2019-Ohio-198, ¶ 16, quoting *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, ¶ 20. "In weighing the evidence, there is a presumption in favor of the findings made by the finder of fact and evidence susceptible to more than one construction will be construed to sustain the verdict and judgment." *In re M.A.*, 12th Dist. Butler No. CA2019-08-129, 2019-Ohio-5367, ¶ 15. "We are especially mindful of this in permanent custody cases." *In re M.G.*, 12th Dist. Warren No. CA2020-10-070, 2021-Ohio-1000, ¶ 26. This is because "the demeanor and attitude of the witnesses may not translate into the record." *C.A. v. H.S.*, 12th Dist. Fayette No. CA2019-09-021, 2020-Ohio-4352, ¶ 16, citing *Miller v. Miller*, 37 Ohio St.3d 71, 74 (1988).

*R.C. 2151.414(B)(1) and the Applicable Two-Part Permanent Custody Test*

{¶ 17} The state is required to prove by clear and convincing evidence that the statutory standards for permanent custody have been met before a natural parent's constitutionally protected liberty interest in the care and custody of her children may be terminated. *In re R.K.*, 12th Dist. Warren Nos. CA2021-03-027 and CA2021-03-028, 2021-Ohio-3074, ¶ 14, citing *Santosky v. Kramer*, 455 U.S. 745, 759, 102 S.Ct. 1388 (1982). In Ohio, it is R.C. 2151.414(B)(1) that sets forth the statutory standard for permanent custody applicable to the case at bar. *In re M.H.*, 12th Dist. Clermont Nos. CA2021-08-050 thru CA2021-08-052, 2022-Ohio-49, ¶ 30. R.C. 2151.414(B)(1) provides a two-part permanent custody test. *See In re A.M.*, 166 Ohio St.3d 127, 2020-Ohio-5102, ¶ 18. One part of that two-part permanent custody test requires the juvenile court to find the grant of permanent

custody to be in the children's best interest.[2]  *In re D.K.W.*, 12th Dist. Clinton No. CA2014-02-001, 2014-Ohio-2896, ¶ 21.  This is generally done by utilizing the best-interest factors set forth in R.C. 2151.414(D)(1).  *In re S.W.*, 12th Dist. Preble Nos. CA2022-08-013 and CA2022-08-014, 2023-Ohio-118, ¶ 19.  These factors include, but are not limited to: (1) the interaction and interrelationship of the children with the children's parents; (2) the wishes of the children, as expressed directly by the children or through the children's guardian ad litem; (3) the custodial history of the children; and (4) the children's need for a legally secure permanent placement.  R.C. 2151.414(D)(1)(a)-(d).  These factors also include whether any of the circumstances listed in R.C. 2151.414(E)(7) to (11) apply.  *In re G.A.*, 12th Dist. Clermont No. CA2022-11-079, 2023-Ohio-643, ¶ 41, citing R.C. 2151.414(D)(1)(e).

*Mother's Arguments and Analysis*

{¶ 18} Mother argues the juvenile court erred by finding it was in the children's best interest to grant CCCS' motion for permanent custody.  To support this claim, Mother initially argues that it was not in the children's best interest to grant CCCS' motion because, now that she has engaged in her case plan services and been able to maintain her sobriety for several months without relapsing, she has obtained the necessary tools to properly care for the children and develop a "maternal relationship" with the children that "is worth preserving."  Mother also argues that it was not in the children's best interest to grant CCCS' permanent custody motion because the children's current placements could be maintained "indefinitely" without the need to grant permanent custody to CCCS.

---

2. The other part of that two-part test requires the juvenile court to find any one of the circumstances set forth in R.C. 2151.414(B)(1)(a) to (e) applies.  *In re C.B.*, 12th Dist. Clermont No. CA2015-04-033, 2015-Ohio-3709, ¶ 10.  "This includes a circumstance, often referred to as the '12 of 22' provision, where the subject child has been in the temporary custody of the agency for at least 12 months of a consecutive 22-month period."  *In re A.D.*, 12th Dist. Clermont No. CA2021-11-060, 2022-Ohio-736, ¶ 20, citing R.C. 2151.414(B)(1)(d).  Mother concedes that the children were in the temporary custody of CCCS for at least 12 months of a consecutive 22-month period prior to CCCS filing its motion for permanent custody in this case.

{¶ 19} Mother further argues that it was not in the children's best interest to grant CCCS' motion because "[t]here is so much uncertainty about the future of both boys and their relationship to each other that an immediate, irrevocable decision is reckless." This is in addition to Mother arguing that it was not in the children's best interest to grant CCCS' permanent custody motion because, although the children expressed their wishes to never visit, reside, or reunify with her again, the children's feelings towards her could change "with time and therapy." However, upon a full and thorough review of the record, we find none of Mother's arguments, either when considered individually or collectively as a whole, have merit. The record instead fully supports the juvenile court's decision finding it was in the children's best interest to grant CCCS' permanent custody motion.

{¶ 20} "The key concern in a permanent custody proceeding is 'whether the parent has substantially remedied the concerns that caused the child's removal from the parent's custody.'" *In re D.B.*, 12th Dist. Warren Nos. CA2019-06-065 thru CA2019-06-067, 2019-Ohio-4514, ¶ 11, quoting *In re S.M.*, 12th Dist. Clermont No. CA2015-01-003, 2015-Ohio-2318, ¶ 24. The record indicates that Mother has been able to remedy many of those concerns, at least in the short term. This includes Mother maintaining her sobriety. But, although we commend Mother for her newfound sober lifestyle, the fact that Mother may have substantially remedied many of those initial concerns that caused the children's removal is not the only issue at play. It is not even the most salient. The main concern – one that overrides all else – is what is in the best interest of the children. *In re G.W.*, 12th Dist. Butler No. CA2019-01-003, 2019-Ohio-1586, ¶ 54.

{¶ 21} "'A child's best interests are served by the child being placed in a permanent situation that fosters growth, stability, and security.'" *In re D.E.*, 12th Dist. Warren Nos. CA2018-03-035 and CA2018-04-038, 2018-Ohio-3341, ¶ 60, quoting *In re Keaton*, 4th Dist.

Ross Nos. 04CA2785 and 04CA2788, 2004-Ohio-6210, ¶ 61. The record in this case indicates that returning the children to Mother's care, even if just for a brief, temporary reunification, could have significant impact on their development and potential to grow and mature into well-rounded adults given the overwhelming harm that she caused to the children while they were in her care. The fact that Mother has seemingly turned her life around does not act as a counterbalance to that harm, nor does it mean the children would necessarily want to be placed back with Mother in the future even after undergoing additional therapy to address their trauma.

{¶ 22} Mother has made mistakes. We all make mistakes. But the mistakes that Mother made did not just impact her own life. Mother's mistakes had a profound impact on the children's stability, as well as on their safety and security, thus resulting in both children becoming victims of physical and sexual abuse. That is to say nothing of the fact that, although Mother has recently been able to maintain her sobriety, Mother has a history of relapsing, thus raising the very real possibility that Mother may do so again. These children's lives are not an experiment that can be left to chance. *In re R.D.*, 12th Dist. Clermont Nos. CA2021-05-017 and CA2021-05-018, 2021-Ohio-3780, ¶ 39. That is, stated differently, "'[t]he law does not require the court to experiment with a child's welfare to see if the child will suffer great detriment or harm.'" (Internal brackets omitted.) *In re B.C.*, 12th Dist. Warren Nos. CA2018-03-024 and CA2018-03-027, 2018-Ohio-2673, ¶ 30, quoting *In re R.S.-G.*, 4th Dist. Athens No. 15CA2, 2015-Ohio-4245, ¶ 53.

{¶ 23} Returning the children to Mother's care would be just that type of experiment given Mother's lack of any consistent, long-term sobriety. Returning the children to Mother's care would have also been contrary to the guardian ad litem's recommendation, as well as the recommendations offered by both of the children's respective counselors. Although

certainly not dispositive, *see In re A.D.*, 3d Dist. Seneca No. 13-22-12, 2023-Ohio-2442, ¶ 54, these recommendations were undoubtably relevant factors for the juvenile court to consider when ruling on CCCS' permanent custody motion, thus giving further credence to the juvenile court's permanent custody decision. Therefore, because the juvenile court's decision granting CCCS' motion for permanent custody was supported by sufficient evidence and was not against the manifest weight of the evidence, Mother's single assignment of error lacks merit and is overruled.

**Conclusion**

**{¶ 24}** For the reasons outlined above, and having now overruled Mother's single assignment of error, Mother's appeal from the juvenile court's decision to grant CCCS' motion for permanent custody is denied.

**{¶ 25}** Judgment affirmed.

S. POWELL, P.J., and BYRNE, J., concur.