[Cite as *In re K.P.*, 2025-Ohio-5060.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

WARREN COUNTY

IN RE:                                          :

    K.P.                                         :

                                            :

                                            :

                                            :

CASE NO. CA2025-06-049

OPINION AND
JUDGMENT ENTRY
11/7/2025

APPEAL FROM WARREN COUNTY COURT OF COMMON PLEAS
JUVENILE DIVISION
Case No. 24-D000064

Mark W. Raines, for appellant.

David P. Fornshell, Warren County Prosecuting Attorney, and Kirsten A. Brandt, Assistant Prosecuting Attorney, for appellee.

**O P I N I O N**

**PIPER, J.**

{¶ 1} Appellant ("Mother") appeals from the decision of the Warren County Court of Common Pleas, Juvenile Division, granting permanent custody of her son, K.P., to

appellee, Warren County Children Services ("WCCS"). For the reasons outlined below, we affirm the juvenile court's decision.

**Facts and Procedural History**

{¶ 2}   On May 8, 2024, Mother gave birth to K.P., a boy.[1] Both Mother and K.P. tested positive for THC at the time of K.P.'s birth.[2] The following month, on June 18, 2024, WCCS filed a complaint with the juvenile court alleging K.P. was an abused and dependent child. WCCS filed its complaint after it was discovered K.P. had suffered bruising to his left forearm, chest, and abdomen, as well as four broken ribs, while in Mother's care. It was during this time that K.P. was residing with Mother at his maternal grandparents' ("Grandparents") home located in Waynesville, Warren County, Ohio.[3]

{¶ 3}   Upon the juvenile court receiving WCCS' complaint, K.P. was placed in the emergency shelter care and interim temporary custody of WCCS. Following K.P.'s removal, Grandparents moved the juvenile court seeking to intervene in the case. Grandparents also moved the juvenile court to grant them legal custody of K.P. Shortly thereafter, on August 28, 2024, the juvenile court held an adjudicatory hearing where it adjudicated K.P. as an abused and dependent child. This adjudication was made based upon a stipulation of facts. These stipulated facts included a stipulation that Mother claimed to have "no explanation" for how K.P. received his injuries.

{¶ 4}   On September 11, 2024, Grandparents voluntarily dismissed both their motions seeking to intervene in the case and for legal custody of K.P. In so doing,

---

1. Mother was a 16-year-old minor at the time of K.P.'s birth, whereas K.P.'s father was a 20-year-old adult.

2. "The abbreviation THC is short for Tetrahydrocannabinol. Tetrahydrocannabinol is the active ingredient and main psychoactive compound found in marijuana." *In re M.G.*, 2023-Ohio-1316, ¶ 3, fn. 2 (12th Dist.).

3. K.P.'s father, as well as Grandparents' four other children, were also residing at Grandparents' home when K.P.'s injuries were discovered. Neither K.P.'s father, nor any of Grandparents' four other children, are a party to this appeal. The same holds true for Grandparents. It is only Mother who appeals from the juvenile court's decision to grant WCCS' motion for permanent custody.

Grandparents noted that their desire to care for K.P. had not changed. Grandparents claimed that it was instead "clear from multiple interactions with WCCS case workers and supervisors that WCCS [was] not prepared to support their motion for custody." The following day, on September 12, 2024, the juvenile court held a disposition hearing where it issued a dispositional decision granting temporary custody of K.P. to WCCS. There is no dispute that this was the last day that Mother had any in-person contact with K.P.

{¶ 5} On November 1, 2024, WCCS issued a decision denying Grandparents' home study. In so doing, WCCS noted that K.P. was at that time still less than six months old. This rendered K.P. unable to protect himself, to report child abuse or neglect, and be able to recognize neglectful and abusive behavior by those around him. WCCS noted that this was particularly concerning with respect to Grandparents' home study. This was because just a few months earlier, in August of 2024, another of Grandparents' children, K.P.'s then 14-year-old aunt ("Aunt"), "admitted to cutting herself, breaking a television set, and punching a hole in the wall due to a household member throwing a bug at her." WCCS stated that Aunt's actions, for which she was recommended to receive inpatient mental health treatment, suggested that Aunt suffered from "a lack of self-control."[4] WCCS determined that this was a deal breaker with respect to Grandparents' home study because K.P. required "all household members to be able to control their actions" given K.P.'s age and vulnerabilities.

{¶ 6} On January 3, 2025, Grandparents refiled their motion seeking to intervene in the case. Grandparents also refiled their motion for legal custody of K.P. To support their refiled motions, Grandparents argued that allowing them to intervene in the case

---

4. Although not referenced within WCCS' decision to deny Grandparents' home study, the record indicates that Aunt has low cognitive abilities and functions as a nine-year-old child. The record also indicates that Aunt's mental health struggles have resulted in occasional violent outbursts. These violent outbursts include, as noted more fully below, the potential for Aunt to break things and punch holes in the wall of Grandparents' home.

and be awarded with legal custody of K.P. would provide him with the permanency that he deserved. Grandparents advanced this argument despite having received notice that WCCS had denied their home study given its concerns about the potential for Aunt and K.P. to both be residing in their home at the same time.

{¶ 7} On March 10, 2025, WCCS moved the juvenile court for permanent custody of K.P. To support its permanent custody motion, WCCS noted that both Mother and K.P.'s father had informed the agency that they had moved out of state, leaving K.P. behind. WCCS also noted that since moving out of state both Mother and K.P.'s father had "ceased facilitating facetime communications" with K.P. WCCS further noted that, as far as the agency was aware, neither Mother nor K.P.'s father had completed any of their required case plan services. This is in addition to WCCS noting that the agency had exhausted all other placement options for K.P. This included K.P.'s potential placement with Grandparents.

{¶ 8} Two weeks later, on March 24, 2025, the juvenile court issued a decision denying both of Grandparents' refiled motions seeking to intervene in the case and for legal custody of K.P. In so doing, the juvenile court determined that Grandparents could intervene in the case only if they could prove they had acted in loco parentis with respect to K.P., something the juvenile court determined Grandparents had not established prior to K.P.'s removal from Mother's care. Specifically, as the juvenile court stated when denying Grandparents' refiled motion to intervene:

> Although they clearly have been involved in the child's life, their involvement never established that they stood in an in loco parentis relationship. Having failed to establish that they stood in loco parentis, Grandparents are not entitled to intervene [in the case].[5]

---

5. The juvenile court denied Grandparents' motion to intervene under both Civ.R. 24(A) and (B). It is only the juvenile court's rationale for denying Grandparents' motion to intervene with respect to Civ.R. 24(B) that is relevant to this appeal.

(Internal citation deleted.). The juvenile court used this same rationale to deny Grandparents' refiled motion for legal custody of K.P.

{¶ 9} Upon denying Grandparents' refiled motions, the juvenile court then scheduled the matter for a hearing on WCCS' motion for permanent custody. This hearing was to take place on May 19, 2025. However, before that hearing could take place, Grandparents renewed both their motions seeking to intervene in the case and for legal custody of K.P. These renewed motions included Grandparents requesting the juvenile court afford them with the opportunity to present evidence in support of their refiled motions to intervene and for legal custody at the upcoming hearing being held on WCCS' motion for permanent custody.

{¶ 10} On May 19, 2025, the juvenile court held the previously scheduled hearing on WCCS' permanent custody motion.[6] But, prior to the juvenile court accepting evidence on that motion, the juvenile court allowed Grandparents to present evidence in support of their refiled motion to intervene. This included the juvenile court hearing testimony from K.P.'s maternal step-grandmother ("Grandmother"). As part of her testimony, Grandmother testified that it was Mother who was primarily responsible for taking care of K.P. prior to his removal from Mother's care. Grandmother also testified that it was only on the "very rare" occasion when Mother asked for help that she and K.P.'s maternal grandfather ("Grandfather") would pitch in to give Mother a break. Grandmother testified that they would do this either by helping bathe K.P. or by doing K.P.'s laundry. This was in addition to Grandmother testifying that she and Grandfather had assisted Mother by occasionally purchasing baby formula for K.P. Grandmother testified that she and

---

6. Mother did not appear at the hearing held on WCCS' motion for permanent custody. Neither did K.P.'s father.

Grandfather did this up until Mother started receiving WIC program benefits.

{¶ 11} Upon hearing this testimony, and without allowing Grandparents to present any additional evidence in support of their refiled motion for legal custody, the juvenile court made an oral pronouncement denying both of Grandparents' refiled motions to intervene and for legal custody. In so doing, the juvenile court initially noted that these types of cases are the toughest cases that it must decide. But, although requiring difficult decisions to be made, the juvenile court stated that based on the civil rules and case law set forth in its earlier March 24, 2025 decision:

> I don't find that this is one in which you can intervene [in this case]. I just don't. Because of that, you don't get to be included as part of the proceeding. So, I'm gonna maintain my denial of your motion[s to intervene and for legal custody]. I apologize to you. That's my answer. So, if you wouldn't mind, give us the room, and we're gonna proceed with the State's motion for permanent custody.

{¶ 12} After making this pronouncement, the juvenile court then moved on to WCCS' motion for permanent custody. To support its permanent custody motion, WCCS presented just one witness, Joesph Staudt, the ongoing caseworker assigned to K.P.'s case. As part of his testimony, Staudt testified that Mother did not complete any of her required case plan services. These services included Mother submitting to a drug and alcohol assessment, as well as Mother attending parenting classes. These services also included Mother submitting to routine drug screens. Staudt testified that Mother had submitted to just two drug screens during the pendency of this case, both of which came back positive for THC.

{¶ 13} On the other hand, as it related to K.P., Staudt testified that K.P. was "very attached," and "very well bonded" to his foster family. Staudt testified that he came to this conclusion because:

> [K.P.] plays, and he interacts with their two children. [K.P.'s]

- 6 -

interactive with the mother and father, in terms of walking up
to them, using them to hoist himself up to cruise on furniture
and, basically, looks to them for his support.

Staudt also testified that he had no concerns regarding K.P.'s health and well-being while in his foster family's care. Staudt further testified that K.P.'s foster family was "meeting all of [K.P.'s] needs." This was in addition to Staudt testifying that K.P.'s foster family was "willing and wanting" to adopt K.P. should WCCS' motion for permanent custody be granted.

{¶ 14} Staudt also testified regarding WCCS' efforts to find a relative placement for K.P. This included Staudt testifying that Mother was at that time "adamant" that she did not want K.P. to be placed with Grandparents. Explaining why that was, Staudt testified:

> [Mother] did not want [Grandparents] to have placement because [she] felt that [Grandfather] was too violent, and had assaulted her and her grandfather, and, I believe it was her mother's ex-boyfriend[,] assaulted them in Maryland, that [Mother] felt that it would be a very unhealthy placement for [K.P.] to be in because of the violence. Also, there were issues with [Aunt] living in the home where she had [once] punched [Grandfather], and [Grandfather] had punched her back. [A]nother case where [Aunt] had behaviors in the home where she had broken the TV, punched a hole in the wall, those kinds of things.

{¶ 15} Staudt testified that WCCS nevertheless considered Grandparents as a potential placement for K.P. Staudt testified that this remained the case up until WCCS issued its decision denying Grandparents' home study on November 1, 2024. Staudt testified it was at this time that WCCS "moved on to other relatives" as potential placements for K.P. Staudt testified that this was in addition to WCCS investigating other potential non-relative placements for K.P. Staudt testified that this included WCCS looking into the possibility of placing K.P. with his godmother. But, as Staudt testified, none of those potential placements were determined by WCCS to be viable options for K.P.

{¶ 16} On May 21, 2025, the juvenile court issued a decision granting WCCS'

motion for permanent custody. In so ruling, the juvenile court found, by clear and convincing evidence, that K.P. could not be placed with Mother within a reasonable time or should not be placed with Mother. The juvenile court reached this decision based upon its finding Mother had moved out of state "with no plans or reunifying" with K.P.[7] The juvenile court also found Mother had not completed any of her required case plan services. This was in addition to the juvenile court finding a grant of permanent custody to WCCS was in K.P.'s best interest. In so holding, the juvenile court noted that K.P. was "bonded" with his foster family, that K.P.'s needs were being met by his foster family, and that K.P.'s foster family had expressed an interest in adopting K.P. should WCCS' motion for permanent custody be granted.

{¶ 17} On June 20, 2025, Mother filed a notice of appeal. Following briefing, on October 16, 2025, Mother's appeal was submitted to this court for consideration. Mother's appeal now properly before this court for decision, Mother has raised two assignments of error for review.

**Mother's First Assignment of Error**

{¶ 18} THE TRIAL [COURT] ERRED IN HOLDING IT MUST DENY INTERVENTION OF GRANDPARENTS BECAUSE GRANDPARENTS NEVER ACTED IN LOCO PARENTIS OF MINOR CHILD.

{¶ 19} In her first assignment of error, Mother argues the juvenile court erred by denying Grandparents' motion seeking to intervene in this case. To support this claim, Mother argues the juvenile court incorrectly concluded that Grandparents could intervene in the case only if they had acted in loco parentis with K.P.

{¶ 20} Mother, however, does not have standing to appeal the juvenile court's

---

7. Mother and K.P.'s father moved out of state on July 22, 2024 to live with Mother's legal guardian. Mother's legal guardian is K.P.'s maternal great-grandfather who the record indicates lives in Maryland.

decision denying Grandparents' motion to intervene. *See In re J.D.*, 2014-Ohio-5726, ¶ 71 (7th Dist.) ("[a] parent . . . does not have standing to appeal an order denying the children's grandparent's motion to intervene"), citing *In re Lloyd*, 2005-Ohio-2380, ¶ 35 (5th Dist.); *see, e.g., In re D.B.*, 2019-Ohio-4439, ¶ 14 (10th Dist.) (father lacked standing to appeal juvenile court's decision denying a grandfather's motion to intervene in a permanent custody proceeding), citing *In re M.D.*, 2019-Ohio-3674, ¶ 60 (10th Dist.) (mother lacked standing to appeal the denial of her sister's motion to intervene in a permanent custody proceeding); and *In re D.T.*, 2008-Ohio-2287, ¶ 8 (10th Dist.) (mother lacked standing to appeal the denial of her second-cousin's motion to intervene in a permanent custody proceeding).

{¶ 21} It is only Grandparents who have standing to appeal that decision. *In re J.D.* at ¶ 70 ("[w]here a grandparent files a motion to intervene which is denied and permanent custody is granted to the agency, the grandparent has standing to contest the denial of the motion to intervene"). Therefore, without offering any opinion as to the merits of Mother's argument, because Mother lacks standing to challenge the juvenile court's decision denying Grandparents' motion seeking to intervene in this case, Mother's first assignment of error is overruled.

## Mother's Second Assignment of Error

{¶ 22} THE TRIAL [COURT] ERRED IN NOT ALLOWING GRANDPARENTS TO PRESENT EVIDENCE AS TO THEIR MOTION FOR LEGAL CUSTODY PURSUANT TO [R.C.] 2151.353(A)(3).[8]

{¶ 23} In her second assignment of error, Mother argues the juvenile court erred

---

8. Pursuant to R.C. 2151.353(A)(3), if a child is adjudicated an abused, neglected, or dependent child, the juvenile court may "[a]ward legal custody of the child to either parent or to any other person who, prior to the dispositional hearing, files a motion requesting legal custody of the child."

by denying Grandparents' motion for legal custody of K.P. To support this claim, Mother argues that it was improper for the juvenile court to prohibit Grandparents from presenting evidence in support of their motion for legal custody at the hearing held on WCCS' motion for permanent custody.

{¶ 24} However, just as Mother has no standing to appeal the juvenile court's decision to deny Grandparents' motion to intervene, Mother also has no standing to appeal the juvenile court's decision to deny Grandparents' motion for legal custody. *See, e.g., In re T.W.*, 2013-Ohio-1754, ¶ 8-9 (1st Dist.) (father lacked standing to appeal the denial of great-grandmother's motion for legal custody because father could not raise issues on behalf of a nonappealing third-party in a permanent custody proceeding). This includes Mother having no standing to challenge the juvenile court's decision prohibiting Grandparents from presenting evidence in support of their motion for legal custody at the hearing held on WCCS' motion for permanent custody. *See In re J.C.*, 2010-Ohio-2422, ¶ 15 (10th Dist.) (mother lacked standing to appeal and assert rights belonging to grandmother who did not appeal in a permanent custody proceeding). This is because, even in permanent custody cases, "[a]n appellant cannot raise issues on another's behalf, especially when that party could have appealed the issues appellant posits." *In re D.T.*, 2008-Ohio-2287, at ¶ 8.

{¶ 25} Grandparents could have appealed the juvenile court's decision denying their motion for legal custody of K.P. Such appeal would have afforded Grandparents the opportunity to argue that it was improper for the juvenile court to prohibit them from presenting evidence in support of their motion for legal custody at the hearing held on WCCS' motion for permanent custody. *See generally In re T.L.C.*, 2023-Ohio-3929, ¶ 6-7 (12th Dist.) (where grandmother argued "the principles underlying her procedural due process rights required the juvenile court to give her an opportunity to be heard and

present evidence in support of her legal custody motions before the juvenile court could grant permanent custody of [her two grandchildren] to WCCS"). Grandparents did not appeal. It was instead Mother who appealed.

{¶ 26} Consequently, just as with Mother's challenge to the juvenile court's decision denying Grandparents' motion to intervene, Mother also has no standing to challenge whether the juvenile court erred by denying Grandparents' motion for legal custody. *See In re Miller*, 2005-Ohio-856, ¶ 64-66 (5th Dist.) (mother lacked standing to challenge the denial of paternal aunt's motion for legal custody in a permanent custody proceeding); *see, e.g., In re D.J.*, 2025-Ohio-2573, ¶ 22 (10th Dist.) (finding a mother's "basic premise that [father] would have been awarded legal custody is faulty, and does not confer standing" upon mother to raise issues on father's behalf in a permanent custody proceeding). To the extent that Mother may claim otherwise, such argument lacks merit.

{¶ 27} Mother's challenge is instead limited to whether the juvenile court erred by granting WCCS' motion for permanent custody. *See In re Pitman*, 2002-Ohio-2208, ¶ 70 (9th Dist.) ("[a] parent has no standing to assert that the court abused its discretion by failing to give [a family member] legal custody; rather, the challenge is limited to whether the court's decision to terminate parental rights was proper"). More specifically, Mother's challenge is limited to whether the statutory standard for permanent custody had been met in this case. *In re R.K.*, 2021-Ohio-3074, ¶ 14 (12th Dist.), citing *Santosky v. Kramer*, 455 U.S. 745, 759 (1982). Mother can do this by challenging either the sufficiency of the evidence, the manifest weight of the evidence, or both. *See In re N.G.*, 2024-Ohio-31, ¶ 13 (12th Dist.).

{¶ 28} Sufficiency of the evidence tests the burden of production. *In re M.W.*, 2025-Ohio-1968, ¶ 9 (12th Dist.). Consequently, "the juvenile court's decision to grant

permanent custody must be supported by sufficient evidence." *In re P.E.*, 12th Dist. Clermont No. CA2023-04-021, 2023-Ohio-2438, ¶ 14. On the other hand, manifest weight tests the burden of persuasion. *In re A.V.*, 2024-Ohio-1091, ¶ 32 (12th Dist.). This requires us to weigh the evidence and all reasonable inferences and consider the credibility of the one witness who testified in this case, Staudt. *See In re N.G.*, 2024-Ohio-31, at ¶ 16. We must then determine whether, in resolving conflicts in the evidence, if any, the juvenile court clearly lost its way and created such a manifest miscarriage of justice that its judgment granting WCCS' motion for permanent custody must be reversed. *Id*.

{¶ 29} R.C. 2151.414(B)(1) sets forth the statutory standard for permanent custody applicable to this case. *In re M.H.*, 2022-Ohio-49, ¶ 30 (12th Dist.). That statute provides a two-part permanent custody test. *In re D.D.*, 2024-Ohio-5858, at ¶ 22 (12th Dist.).

{¶ 30} One part of that two-part permanent custody test requires the juvenile court to find the grant of permanent custody to be in the children's best interest. *In re J.K.*, 2025-Ohio-3190, ¶ 11 (12th Dist.). This is generally done by utilizing the best-interest factors set forth in R.C. 2151.414(D)(1). *In re S.W.*, 2023-Ohio-118, ¶ 19 (12th Dist.). These factors include, but are not limited to, the interaction and interrelationship of the child with his parents, relatives, and foster caregivers. R.C. 2151.414(D)(1)(a). The other part of that two-part permanent custody test requires the juvenile court to find applicable any one of the circumstances set forth in R.C. 2151.414(B)(1)(a) through (e). *In re C.B.*, 2015-Ohio-3709, ¶ 10 (12th Dist.). This includes a circumstance, sometimes referred to as the juvenile court's "could not/should not be placed" finding, where the child cannot be placed with either of his parents within a reasonable time or should not be placed with his parents. *In re B.T.*, 2025-Ohio-3019, ¶ 40 (12th Dist.), citing R.C. 2151.414(B)(1)(a).

{¶ 31} Upon review, we find no error in the juvenile court's decision to grant WCCS' permanent custody motion. This holds true even in the face of Grandparents' competing

motion for legal custody. This is because, as it is now well established, "[i]f permanent custody to the [a]gency is in the children's best interests, legal custody to a relative necessarily is not." *In re K.C.*, 2024-Ohio-5269, ¶ 37 (5th Dist.). In so holding, we note that the record fully supports the juvenile court's decision finding, by clear and convincing evidence, that K.P. could not be placed with Mother within a reasonable time or should not be placed with Mother given that Mother has moved out of state with K.P.'s father, leaving K.P. behind. The record also fully supports the juvenile court's decision finding a grant of permanent custody to WCCS was in K.P.'s best interest when considering the success K.P. has achieved while in the custody and care of his foster family.

{¶ 32} That Grandparents had expressed a willingness to care for K.P. does not change this fact. This is because, as it is now equally well established, "[t]he willingness of a relative to care for a child does not alter what a court considers in determining permanent custody." *Id*. at ¶ 72. This is particularly true in this case when considering Grandparents' home study had been denied over WCCS' concerns regarding Aunt's mental health and ability to control her actions. This is in addition to the fact that, prior to this appeal, Mother was "adamant" that she did not want K.P. to be placed with Grandparents given her concerns over Grandfather's propensity for violence.[9] Therefore, because we find no error in the juvenile court's decision to grant WCCS' motion for permanent custody, Mother's second assignment of error is also overruled.

**Conclusion**

{¶ 33} For the reasons outlined above, the juvenile court did not err by granting

---

9. The record also indicates that Grandfather has a criminal record that resulted in him serving seven years of a 14-year prison sentence following his 1999 conviction for burglary. This is in addition to Grandfather having a 2011 conviction for operating a motor vehicle while under the influence of alcohol. The record further indicates that three of Grandparents' four other children raised issues with respect to Grandfather's propensity for violence. This included those three children advising an interviewer from the child advocacy center tasked with investigating K.P.'s injuries that Grandfather had been physical with two of them by smacking, shoving, and pushing them, as well as pinning one of them to the ground.

permanent custody of K.P. to WCCS. Accordingly, finding no error in the juvenile court's decision to grant WCCS' motion for permanent custody, Mother's appeal is denied.

{¶ 34} Judgment affirmed.

HENDRICKSON, P.J., and SIEBERT, J., concur.

---

## J U D G M E N T   E N T R Y

The assignments of error properly before this court having been ruled upon, it is the order of this court that the judgment or final order appealed from be, and the same hereby is, affirmed.

It is further ordered that a mandate be sent to the Warren County Court of Common Pleas, Juvenile Division, for execution upon this judgment and that a certified copy of this Opinion and Judgment Entry shall constitute the mandate pursuant to App.R. 27.

Costs to be taxed in compliance with App.R. 24.

/s/ Robert A. Hendrickson, Presiding Judge

/s/ Robin N. Piper, Judge

/s/ Melena S. Siebert, Judge